No. 29,673.

THE STATE OF KANSAS, *Appellee*, v. HAL MENDENHALL, *Appellant.*

(3 P. 2d 489.)

Opinion filed October 10, 1931.

*A. J. Herrod* and *H. S. Roberts,* both of Kansas City, for the appellant.

*Roland Boynton,* attorney-general, *R. O. Mason,* assistant attorney-general, *Frederick R. White,* county attorney, and *Lee E. Weeks,* deputy county attorney, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Hal Mendenhall was found guilty in the first degree of the murder of his wife, Anna Ritchey Mendenhall. He has appealed and contends that the court erred (1) in overruling defendant's motion to be discharged at the close of the state's evidence in chief; (2) in the admission of evidence; (3) in refusing to give instructions requested, and in instructions given; and (4) in refusing to grant a new trial, (a) because of misconduct of the prosecuting attorney, especially in his closing argument, and (b) because of misconduct and prejudice of the jury. And generally it is argued that defendant did not have a fair trial. We shall discuss these questions in the order stated.

Defendant does not contend that a motion for an instructed verdict in his favor, if made at the close of all the evidence, should have been sustained—indeed, no such motion was made at the time—but does contend that at the close of the state's evidence in chief the motion for his discharge, which was then made, should have been sustained for the reason that the evidence was insufficient to sustain any charge contained in the information. The state's evidence in chief may be summarized as follows:

Defendant and Thelma Rouzer, of Kansas City, Mo., were married in Clay county, Missouri, March 22, 1928. She obtained a divorce from him, in the circuit court of Jackson county, Missouri, September 24, 1929. Before the divorce was granted, and on January 7, 1929, defendant and Anna Ritchey were married at Leavenworth, Kan. At the time of this marriage, and for some time prior thereto, Anna Ritchey lived at 401 North Seventh street in Kansas City, Kan., with her two children, Uriah, about ten years old, and Raymond, about five. She had obtained a divorce from her former husband and was keeping roomers. Defendant had become acquainted with her a few months before their marriage, and after their marriage went there to live, and contributed to the support of the family. While living there they had trouble. On one occasion the older boy came home from school and found them fighting —defendant struck her and she struck him, and they hit back and forth. After about a month and a half they moved to 1711 Cleveland avenue. They had trouble there on one occasion. Defendant was striking her and she backed away and went and lay down. After living there about six weeks she took her furniture and children and moved to Leavenworth. Defendant was not at the house at the time and did not know about it. She lived there about two months, then joined defendant and went with him to live on his father's farm, near Brenner Heights, about six miles from Kansas City, the older boy staying at Leavenworth until school was out, when he joined them. They lived there until late in July, when they moved into Kansas City and rented the property at 643 Freeman avenue. It seems she rented this property and paid the rent to October 1, taking the receipt in her former name, Anna Ritchey. But defendant lived there with the family for awhile. Perhaps early in September she told him to take his clothes and go away. He did so, but returned a few days later and had his clothes brought back. About the middle of September they had an argument and she put his clothes out and told him to go, and he went, and did not return to stay. Defendant was well acquainted with a Mr. Bell, a law student and a deputy clerk of the district court. On October 1, or a day or two before that, he met Bell and asked him to answer a couple of legal questions, if he could. Mr. Bell said he would do the best he could, and defendant asked him, "What is the penalty for bigamy?" Also, "What is the penalty for adultery?" Mr. Bell

gave answers to both questions, but told defendant he was not sure the penalties named by him were correct. On the morning of October 1 defendant went to a garage, where he was acquainted with the workmen, and asked the porter to take his gun to shoot a dog which had bit his little boy. The porter told defendant he did not have a gun. Defendant then asked Homer Lee, a painter employed at the garage, if he had a gun. Lee said he did, but it was at the house. After some talk defendant asked Lee for the gun. Lee said he never did loan a gun to anybody, but in a case of this kind it would be all right. Defendant said that he would want it only an hour or thirty minutes and would bring it back, and said, "I will go down there and if I don't see this dog I will come right back." Lee said, "If you don't keep it any longer than that I will let you have it." Defendant wanted to go to Lee's house to get it. Lee said, "No, my wife won't let you have it." Defendant then asked Lee to bring it when he went to lunch, and Lee said he would. Lee returned from lunch about fifteen minutes of one o'clock and let defendant have the gun. It was a Colt's revolver, "a 38 on a 45 frame," and was fully loaded with six loaded shells. This is the gun with which Anna Ritchey Mendenhall was shot and killed— about an hour after it was loaned to defendant. About 1:30 o'clock that afternoon, October 1, 1929, Miss Horstman, who looked after renting the property (owned by her mother) at 643 Freeman avenue, and who had rented it late in July to Anna Ritchey (Mendenhall), went there to collect the rent for October. She knocked at the door. After some delay Mrs. Mendenhall came to the door and asked her to come in. She went in. Defendant was there, sitting in a chair, with his hat and coat on. The gun which he had borrowed from Lee was in his inside coat pocket, but was noticeable to one who observed him. He got up and said, "Well, I will go out of the room until you are done," and stepped into another room. Mrs. Mendenhall said to Miss Horstman, "You want your rent, don't you?" And, on being answered in the affirmative, went to the buffet drawer and got $30, which she handed to Miss Horstman, and asked if she wanted a piece of paper, and Miss Horstman replied that she had a receipt. Mrs. Mendenhall started into the other room, then turned and walked outdoors onto the porch. Defendant then went out on the porch. Miss Horstman went out on the porch, and at first did not see them, but looked around the corner of the house and saw them

standing there talking. Miss Horstman asked to whom the receipt should be made, and Mrs. Mendenhall said, "To Anna Ritchey." All three sat on the porch and Miss Horstman wrote out the receipt. Then Mrs. Mendenhall said: "Miss Horstman, I hate to treat you like this, but I have to. . . . This is my husband, and I have to leave him." Defendant said: "She wants to send me to the penitentiary." Mrs. Mendenhall said: "He is a bigamist." Defendant then started to tell Miss Horstman about some misconduct he had seen the evening before between his wife and a roomer at her house by the name of O'Dowd. Miss Horstman told him she did not care to hear about their difficulties, that she couldn't settle them, and suggested if he had work to do he had better go do it. Mrs. Mendenhall said he was not working, that he had no job. Miss Horstman again suggested if they had disputes to settle them peaceably. Mrs. Mendenhall said to Miss Horstman: "I wish you wouldn't leave," but she said she couldn't stay there; and defendant said, "She is an innocent party; she doesn't know anything about it." Mrs. Mendenhall said: "He has a gun, he is going to shoot me." Defendant made some remark, and Mrs. Mendenhall said: "Well, you will read about it in the papers in the morning." Defendant said: "She won't read anything but a divorce." She then asked: "What have you got that gun on you for?" He said: "Anna, I didn't mean to get you; I meant to get the other fellow." (Doubtless referring to O'Dowd.) Defendant asked her to go in the house a minute, that he wanted to speak to her. She replied that she did not want to talk with him, and suggested that he see her lawyer. After advising the parties to settle their difficulties peaceably, Miss Horstman went away. She had been there perhaps ten minutes. Between 1:30 and 2 o'clock that afternoon (the exact time was not shown) defendant telephoned the police department of Kansas City. The exact wording of that message, as given by defendant, was not shown by the state in chief, but the officers to whom it was communicated understood he called and said he had shot his wife. As a result of this call an ambulance, two motorcycle policemen and two officers in an automobile were rushed to the residence, .643 Freeman avenue. When they reached there the defendant was in the street, having gone across the street to call a doctor who lived there. One of the officers called to him and asked him what was the matter, or why he did it, and he said:, "Well,

I had some family trouble," or "just a family quarrel." They started to take him into the house, and he said, "I don't want to go in. Take me to the station." About that time the officers arrived in the automobile, and he was taken to it. He was asked where the gun was and he said it was in the house. One of the officers went in the house, found the gun, brought it out and showed it to defendant, who said: "Yes, that is the gun." He got in the automobile with one of the officers and was taken to the police station. On the way the officers said to him: "What is the matter, Hal?" And he said: "Well, I have shot my wife." The officer asked if it were very bad, and he answered: "Yes, I guess she is hurt pretty bad." Later on the way he said: "We have been having trouble and I looked under the curtain last night at the back of the house and I saw too much." The other officers and the doctor went in the house. They found Mrs. Mendenhall lying on the floor, in the doorway between two rooms. She was breathing but unconscious—she had a hole in her breast. There was quite a bit of blood on the floor. She was placed on a stretcher and carried to the ambulance. Her heart ceased beating while this was being done. The coroner, who later examined her, found that the bullet had entered her breast between the third and fourth ribs, an inch and a half or two inches to the right of the breast bone, had passed through her body and left it at about the eighth rib, lower, from two to four inches, than the point of entrance. She had died from internal hemorrhage caused by a gunshot wound. In the room was an overstuffed chair. There was a bullet hole through the back of that chair, the course of which was downward from front to back, and back of the chair there was a hole in the wall. It was in line with the holes in the back of the chair.

The above is a summary of the state's evidence in chief. The trial court, in denying defendant's motion to be discharged, correctly held the evidence sufficient to go to the jury on the charge of first-degree murder, or at least on some of the offenses embodied in the charge of first-degree murder on which defendant was being tried. It should be remembered that in his statement to the officers he made no suggestion that the shooting was accidental, justifiable, or excusable, or that it was otherwise than intentional on his part. Before discussing other questions argued by defendant a further statement of the evidence is deemed proper. The principal defense

was that the shooting was accidental, that it occurred during a struggle for possession of the gun and while Mrs. Mendenhall was trying to take it away from defendant and he was holding onto it, and that it was unintentional on his part.  But defendant's evidence took a somewhat wider range than that, and was to the effect she was an immoral woman, that she used intoxicating liquor, and frequently used profane and obscene language; that she was hot-tempered and would fight with little or no provocation; that she fought with her first husband, the obvious inference being that he could not live with her on that account, and that on numerous occasions, which defendant detailed in his testimony, she fought him, striking him and tearing his shirt or his pants, and that on several occasions she had threatened to kill him; that she had a little black gun, which she kept in a dresser or her handbag, and that on several different occasions she had drawn that gun on him and threatened to kill him, but each time he took the gun from her without serious difficulty.  As to a few of his wife's fits of anger, which he testified about, he was corroborated by other witnesses whom he called.  No other witness, however, saw or knew of the little black gun.  And no other witness, except a Mrs. Lozier (whose testimony was badly shaken on cross-examination and who refused to appear for further cross-examination, although a subpœna for that purpose was served upon her) testified to her immorality, or her use of intoxicating liquor, and there was an abundance of evidence on rebuttal, from many witnesses who had known her, of her good character and her even-tempered disposition. Broadly speaking, defendant's character was not put in issue.  His father was an old resident of the county, had been sheriff of the county, mayor of the city, and had held other positions of honor and trust, and was a man of high standing, with many friends. Defendant, however, appears to have been quite different.  He testified that he had been married five times, first about 1912, and freely admitted, "I cannot say positively I was divorced from any of those women."  He had served a term in jail at Lawrence for the possession of gin.  He appears not to have accumulated any property, and to have been employed a part of the time only.  The shooting occurred on Tuesday, October 1, 1929.  He testified that he was not home the Sunday evening before the tragedy, and explained his whereabouts; that on Monday he ate at home at noon, and no one was there but himself, his wife, and the little O'Dowd

boy; that on Monday night he walked by the house and saw his wife and a man, whom he afterwards learned was O'Dowd, sitting on the porch in a position he thought improper; that later in the evening he went around the house and looked in at a window where he could hear their talk and observe their conduct; that he heard them talk of people in the neighborhood where they had lived, and of what they had been doing in the years since they had known each other, including immorality indulged in by each of them; that he saw him kiss her and be unduly familiar with her in other respects; that he heard the man ask what "would happen if Hal would come in," and her reply that she guessed both of them could take care of him; that the man finally grabbed his wife and reached up and pulled out the lights; that he went to the telephone and called the chief police officer on duty and asked him to come out there to see something. The officer replied that he was busy and asked defendant to call later; that he did call later, and the officer told him they didn't send policemen to be witnesses in divorce cases, but if he had clothes, or anything at the house that he wanted to get, an officer would be sent to go with him to see that there was no trouble when he got them. He further testified that on Tuesday morning he telephoned to his wife and told her he wanted to come down to the house to get his clothes, and that she said if he had $30 he could have them, that she needed that much money to pay her rent; that he said he had the money, and wanted to go at once and get his clothes; that she asked him to wait until evening, but he objected to going in the evening, and that she finally asked him to wait until after her little boys had gone back to school after lunch. He admitted borrowing the gun from Mr. Lee at the garage and giving a fictitious reason for wanting it. He testified that he went to the house about ten minutes to one o'clock, and that he took the gun with him because he was afraid of O'Dowd; that when he got to the house he went to the door and called his wife and told her he wanted his clothes. She asked him if he had the money. He said he did, and opened his pocketbook and gave her $30; that he had an extra $5 bill, which she grabbed, saying she needed it to pay for water and light; that he went in the house, and his wife said she wanted to talk to him, and that both of them sat in the room and were talking when Miss Horstman came. His testimony as to what took place while she was there was substantially the same as hers. He testified

that after Miss Horstman left he again asked his wife for his clothes, and while they were talking about it the groceryman with whom they traded came to get an order for groceries; defendant told him that they didn't want any groceries. His wife spoke up and said, yes, she wanted some, and would give an order. Defendant then said that he wouldn't pay for any more groceries, and told the groceryman not take an order. The groceryman asked him what about the bill at the store, and he told the groceryman he would call that evening and pay it, and the groceryman went away. He testified that his wife became angry because he refused to order more groceries, and that she grabbed a butcher knife and started after him with it; that he took it away from her and laid it down, and that soon thereafter she grabbed the knife again and tried to strike him with it, and he again took it from her and put it in a cupboard of the cook stove; that he told her he was going to have his clothes if he had to call the police, and started toward the telephone; that his wife then told him to go and get his clothes. He went to the dresser drawer where his clothes usually were, opened it and found some other man's clothing there, but his clothes were not there; that he asked his wife whose clothes those were, and she told him they were O'Dowd's; that he said, "That is a hell of a note," and started to walk away. There was a chair near the door. Both of them started to walk through the door. He was facing south, she facing east, when she said: "Give me that gun," which was then in his inside right coat pocket, and jumped at him and grabbed the gun; that he took hold of the butt of the gun with one hand and tried to hold it in his pocket and with the other hand was pushing her toward the chair; that she had hold of the gun with both hands and tugging at it to get it from him, when the gun was discharged, and that he did not intentionally or consciously fire the gun. He testified that the gun immediately fell to the floor. His wife sat in the chair. He told her to sit there and he would call an ambulance; that he called the city police department and said: "Send the ambulance to 643 Freeman," and was told the ambulance would be sent. That he then turned to give some attention to his wife, who had got up out of the chair and had started to walk and had fallen to the floor; that the little O'Dowd boy came in about that time, and he told the boy to call the lady down from upstairs. The little O'Dowd boy ran outdoors. That he then went to the stairs and called the lady

upstairs and told her his wife was shot and to come down and take care of her while he ran across the street for a doctor; that he did go across the street and called the doctor and was not back at the house when the ambulance and officers came. He testified that he told the officers where the gun was, and identified it when it was brought out; told them that he did not want to go in the house and for them to take him to the station. He specifically denied that he told anyone that he had shot his wife. He testified the statement he made on this occasion was that "My wife has been shot," and that when he was asked how it happened he said it was "over the possession of a gun."

In rebuttal the state called Silas Barber, the groceryman who had been there to take the order just before the casualty. He testified that he knew defendant and his wife, but transacted no business with them except to sell them a few groceries. He testified that on the morning of October 1, the day of the tragedy, defendant came to him and wanted to borrow a gun to shoot a dog. The witness said he had no gun and to speak to the law. Defendant replied that he had called the law and an officer came out there and looked around and said he didn't have time to look for a dog, and went back. He further testified that in the afternoon of that day, along close to two o'clock, he went to the Mendenhall house to get an order for groceries. Defendant and his wife were sitting on the porch. Defendant saw him come and said, "No groceries to-day," that he started to go on past and defendant's wife said, "Yes, I will make out an order," and started to get up; that defendant got up with her and his wife told him to stay out there and talk to the man while she went in and made out an order, but that defendant went on in the house with her; that he stayed there and waited a few minutes and he soon heard some one halloo for help twice, and it occurred to him that it was a family quarrel, and he started to go away. When he got fifteen or twenty feet away from the house he heard a gun fired; that is, he heard a noise that was either a gun or a door shut. He also heard the boy crying inside the house, and heard defendant say: "Shut up, nobody's going to hurt you." He thought possibly the parties in the house didn't want him to hear their quarrel, and had shut the door. He walked on across the street and stopped a few minutes to talk with a neighbor. While they were standing talking the ambulance and officers came to the house.

It was brought out at some time in the trial that after Mrs. Ritchey had obtained a divorce from her husband Ritchey, and a few months before she married defendant, Mr. Ritchey died, leaving an estate, the extent of which was not shown, but she had been appointed guardian for the children, and an allowance of $50 per month, payable out of the estate, had been made to her for their support. It also developed that perhaps a week before the tragedy she had called on one of the leading attorneys at Kansas City and consulted him about getting a divorce from defendant, or having her marriage with him annulled because of the fact that he had another wife living from whom he was not divorced, and also about prosecuting him for bigamy, and the attorney had written defendant a letter on the subject, addressed either to defendant's father, or in care of his father, with whom defendant sometimes made his home.

It was also shown in rebuttal that defendant had no clothes at the house at the time he went down there on October 1, having taken them away a week or two before, at the urgent request of his wife, and not having returned them. There was quite convincing evidence, also, to the effect that neither the evening before the tragedy, nor at any time, was there any misconduct between defendant's wife and O'Dowd, who a few days prior to the tragedy had rented a room from Mrs. Mendenhall and had employed her to take care of his little boy, then about five years old, or less, while he was at work. It was also shown that the gun used had a safety device, which first had to be operated, and then the trigger pulled, before the gun could be fired.

Turning now to the complaints made by defendant with regard to the admission of evidence. Four of these items relate to evidence offered by the state in rebuttal. Defendant had testified that when he asked the porter at the garage that morning for a gun he also asked him to go down to the house with him to get his clothes. The porter was called in rebuttal and testified that defendant said nothing about getting his clothes, but did talk with him about taking his gun to kill a dog. We see no reason why this was not proper rebuttal testimony. Defendant complains that the groceryman, Silas Barber, was called as a rebuttal witness, and contends that his evidence should have been produced in chief. Counsel for the state admit that the evidence would have been proper in chief, but state they did not know of this witness, or of what his testimony would

be until after the state had closed its evidence in chief. A showing of that fact was made to the trial court at the time the witness was called, and the circumstances relating thereto were inquired into at that time. It was proper, under the circumstances, for the court to permit the witness to testify, and at most it was a matter within the sound discretion of the court, and clearly the discretion was not abused. Because defendant's testimony of the trouble between his wife and her first husband, Mr. Ritchey, and the clear inference which he left from his testimony that because she was so high-tempered and such a fighter Ritchey could not live with her, the prosecution, in rebuttal, offered in evidence a certified copy of her decree of divorce, which briefly recited that the divorce was granted to her because of the extreme cruelty of the defendant. Counsel for defendant objected to the introduction of the decree on the ground that the findings therein were binding upon no one except the parties to that action, that it was not binding upon the defendant in this case. The court ruled that counsel was correct, that the findings in the decree would not be binding on the defendant in this action, and that the same could be considered by the jury only together with other evidence bearing on that question. Since the court agreed with counsel for defendant with respect to the effect of the findings in the decree, there is no question concerning the admission of it, as so limited, for this court to pass upon. The police officer who received defendant's telephone call made directly after the tragedy was called and testified that he answered the telephone, and that defendant said: "This is Hal Mendenhall . . . I have just shot my wife, and I wish you would send somebody down here." The officer asked the address and was given it, then said to defendant: "All right, you stay there and I will send somebody down there at once." Defendant contends this evidence should have been offered in chief. Substantially the same thing had been testified to by other officers, hence the question is not very material. In view of defendant's testimony as to the exact words he used in making the call it was not improper to call this witness in rebuttal.

The state offered evidence as to its efforts to subpœna and have the testimony of certain material witnesses. The trial court admitted this, with the admonition to the jury that it should not presume anything those witnesses would testify to, but the evidence was received simply as an explanation of why those witnesses were not called to testify. We see no reasonable objection to that. For

example, a family lived upstairs at the time of the tragedy. Defendant testified he called the lady to come down. She was not offered as a witness at the trial. The court permitted the prosecution to show that her husband had been working in town at the time of the tragedy, that he resigned his position about two weeks thereafter and moved away, and of the efforts made to locate him and his wife, and inability to do so. Naturally a jury would wonder why this witness had not been called. The evidence objected to was admitted to show this reason, but not to establish anything that the witness might know. There was testimony of a similar character as to two other witnesses, who might have been material on less important features of the case. There was no error in this respect.

Complaint is made of the refusal to give instructions requested and of instructions given, particularly on the question of self-defense. The summary of the evidence above given discloses there was little in it upon which to base self-defense. But the court took the view that, under some views of the testimony, the doctrine of self-defense, at least in a limited way, might be in the case. Defendant requested an instruction embodying that view of the evidence, and on that question the court instructed substantially as requested by defendant. There is therefore no error in this particular.

Defendant complains of misconduct of counsel for the prosecution, particularly in the language used in the closing argument. We have read the argument in full, also the argument of the leading counsel for defendant. There is nothing seriously wrong with these arguments. It would serve no useful purpose to detail the criticisms made by defendant. The case had taken a week or more to try, the arguments lasted a full day, and counsel on both sides, in their arguments, made a few—not many—excursions beyond the line of strict propriety. It would have been better had they not done so, but it is clear there is nothing in the complaints here made that would justify a reversal on this point.

Defendant argues that there was misconduct of the jury, and particularly of the juror Ralph Daughaday. On his *voir dire* he had answered satisfactorily the usual questions, that he was not acquainted with the defendant, that he had no bias or prejudice against him, and that he had not formed or expressed an opinion concerning his guilt. On the hearing of the motion for a new

trial defendant offered two witnesses—Mrs. Butler and her husband—who had known this juror many years. Mrs. Butler testified that on the day of defendant's preliminary examination she and her husband met the juror Daughaday in the corridor of the courthouse and talked with him about the fact that defendant's preliminary examination was being held that day; that she stated she would like to hear the case, and that she thought the defendant guilty, and she testified that Daughaday said he thought the defendant guilty and that was one jury he would like to sit on. Mr. Butler testified as to the conversation, but he was not quite so positive that Daughaday had expressed his own opinion with respect to the guilt of defendant. Daughaday testified that he met the parties that day, and the fact that the case was to be tried that day was talked of, but positively denied that he expressed any opinion as to the guilt or innocence of the defendant, and further testified that he had no opinion at that time on that question, and said that he talked mostly with Mr. Butler, soliciting him for an application for insurance in a company for which he was writing insurance. The trial court deemed this question as the only serious one presented on the motion for a new trial, and inquired into it very carefully, and concluded that Mrs. Butler did most of the talking about the case, and that because Mr. Daughaday did not try to argue the question with her she concluded he agreed with her, when, as a matter of fact, he expressed no opinion as to the guilt or innocence of the defendant, and at that time had no such opinion. There is ample evidence to sustain the finding of the trial court on this point, and we concur in it.

To some extent in the printed briefs, but more forcibly in the oral argument, it is contended on behalf of defendant that he did not have a fair trial, that there was a mob spirit prevailing, that the court room was crowded, that at times there were disturbances, that persons crowded up near the jury box and made remarks adverse to defendant, and that the jury had to pass through a crowded corridor where remarks adverse to defendant were made by persons in the crowd. We have carefully examined the record and find nothing in it to justify a complaint of this character. It appears to have been argued to the court on the motion for a new trial. The court stated that it was true there was a crowd, but bailiffs sufficient in number were provided to look after the crowd,

see that the passageway near the jury box was kept clear, and that there was no demonstration. The transcript of the record discloses only a few instances when there was any demonstration, and those occurred when there was a colloquy between counsel, or with counsel and a witness. They were promptly suppressed by the court and the audience rebuked. There is nothing in the record to indicate that any juror heard any remark from anyone in the audience, or that any such remark had a particle of effect on the verdict of the jury. Defendant calls attention to the fact that the verdict of the jury was reached in about thirty minutes. The trial court commented on that in passing on a motion for a new trial. The case had been tried with exceptional thoroughness. A full day had been given to the argument. Every material point in the evidence had been discussed with the jury. The discussions, for the most part, were exceptionally able and helpful to the jury. No doubt by the time the arguments were concluded the jurors were quite well convinced as to their duty in the premises.

Taken as a whole, the defenses offered were not convincing, and it is clear that much of defendant's testimony was false. On the other hand, there is an abundance of substantial evidence to sustain a finding of all of the elements of murder in the first degree; indeed, it is not argued that such evidence is lacking. The transcript of the record, all of which we have carefully examined, discloses that defendant had a fair trial.

The judgment of the court below is affirmed.