## No. 32,898

THE STATE OF KANSAS, *Appellee,* v. HARVEY RIDGE, *Appellant.*

(61 P. 2d 109)

Opinion filed October 10, 1936.

*Kenneth H. Foust, C. J. Peterson, S. A. Gard,* all of Iola, and *E. R. Sloan,* of Topeka, for the appellant.

*Clarence V. Beck,* attorney general, *Theo. F. Varner,* assistant attorney general, *J. C. Edwards,* county attorney, and *Guy Lamer,* of Iola, for the appellee.

The opinion of the court was delivered by

BURCH, C. J.: This is an appeal from a judgment and sentence on a verdict of guilty of murder in the second degree. It is the second appearance of this case in this court (*State v. Ridge*, 141 Kan. 60, 40 Pac. 2d 424).

The principal error now urged is that there was not sufficient evidence to sustain the verdict, and incidental to that point it is contended that the trial court did not approve the verdict.

In its main outlines the evidence *pro* and *con* was similar to that adduced at the first trial, but some matters developed at the former trial were omitted; and it seems advisable to restate the evidence as it appears in the present record.

On a misty and rainy evening, August 28, 1933, after dark, an affray with firearms occurred at the farm home of J. C. (Curt) Johnson, two and one half miles north of Iola, in which the defendant Harvey Ridge was shot through the back, and Johnson was shot through the forehead and killed outright.

Defendant lived in Iola. His acquaintance with Johnson and his wife, particularly the latter, extended over several years. Defendant may have been paying undue attention to Mrs. Johnson. A year and a half or two years before the homicide, Johnson accosted Ridge on the street in Iola, and in the presence of the chief of police had a conversation with defendant. The officer testified:

"Johnson immediately commenced talking to Ridge, told him he was getting too familiar with his wife, that he was breaking up his home, and that he had heard repeatedly about them meeting at different places, and he said he understood that once or twice Ridge had come out to his farm where he lived. He told him, he says, 'I don't want you to speak to her—I don't want you to speak to my wife again when she is by herself or with me, and I don't want you to ever come on my place again.' Ridge told him that he wouldn't. He said that he had met Mrs. Johnson a few times, but that it was just a mutual friendship, and that if it was going to cause any trouble, he wouldn't bother her any more, or wouldn't go on Johnson's place again. That was the gist of the conversation, what they were trying to get at.

"Q. Now, in this conversation, were there any threats made by either party there, against the other, of any kind? A. No, no; nothing further than what I have stated."

On August 28, 1933, defendant purchased six shells for his .38 calibre revolver. That night, between 8 and 9 o'clock, Ridge called at the farm home of Ira Austin, a mile and a half from Johnson's,

and said he had been shot and asked that a doctor be called. He declined to come inside because his feet were muddy and his clothing was bloody. A doctor came and took defendant to town, helped take off his clothes, put him to bed and dressed his wound, which was "a bullet wound in the back, entered at one part of the back (beneath the shoulder blades) and emerged at the opposite side of the back." The doctor notified the sheriff, who drove out to the Johnson farm and found Johnson's body lying at the northwest corner of the farm house. He testified that a gun was in or near the right hand of the dead man and a butcher knife at his left hand. Other witnesses for the state testified similarly, touching the position of the body and of the revolver and knife—Johnson's son, the undersheriff, a Doctor Kerwood, and the undertaker. Doctor Kerwood testified:

"There was a wound on the forehead above the left eye, revolver wound. . . . The bullet penetrated the brain . . . [it] was .38. . . . In my opinion death was caused by gunshot [wound] in the brain; death would have been instant."

On cross-examination, Doctor Kerwood testified:

"Death would have been instantaneous and Mr. Johnson could not have fired any shots after he was hit . . . revolver . . . was in the grip of his relaxed hand, his right hand, and the trigger finger right close to the trigger. The knife was lying right by the left hand and had fallen on the ground right by the left hand. The body fell forward."

The sheriff further testified that on his return to Iola—

"Ridge was in bed. I told him that Johnson had been killed. He said it was too bad it wasn't the other way. I asked him about the gun, and he said it was in a closet there . . . there were five shells in the gun, four of them had been shot. . . . Mr. Ridge said he did not know how many times he shot—three or four; said he might have shot them all. I placed the defendant under arrest."

There was considerable testimony touching bullet marks about the Johnson house which probably came from the revolvers of the combatants; and a slight wound or bruise on Johnson's right forearm, which Doctor Kerwood testified had been "evidently caused by a ricocheting bullet." Lambeth, the undersheriff, testified that on the way out to the Johnson farm he saw Johnson's automobile parked by the roadside half a mile from the Johnson home; that the dead man had one "finger in the trigger and the gun was resting on the ground and was in his right hand," and that there were four empty shells in his six-cylinder gun and two of its chambers were empty.

At the close of the state's evidence, defendant demurred to its sufficiency to establish the crime charged in the information, and moved that the defendant be discharged or that a verdict be directed. This was overruled, and defendant adduced evidence tending to show the circumstances of his visit to the Johnson home that night; that he had come at the request of Mrs. Johnson by telephone and by letter; that Johnson was not at home; that he and Mrs. Johnson sat on the front porch; that her fifteen-year-old daughter was in the house; that Johnson returned and opened fire on defendant, but missed him. the first shot; that he was wounded in the back by Johnson's second shot and fell to the ground; that Mrs. Johnson then fled to a neighbor's and told them what had happened; and that she reported the affair to the sheriff by telephone. Defendant testified at length in his own behalf. According to his testimony, as he and Mrs. Johnson sat on the front porch, which faced the west, he saw a man coming around the south side of the house and going west and north.

"I could not tell who it was. Mrs. Johnson got up and walked to the southwest corner of the porch. She met Mr. Johnson. . . . Mr. Johnson did not say a word. I said nothing to him. He came around the southwest corner of the porch and towards the north a few steps."

On cross-examination defendant testified:

"I left [Iola] rather early in the evening. . . . It was raining part of the time; . . . I had a gun in my possession when I left Iola; I had purchased six cartridges . . . prior to that time. I went . . . up the [railway] track until I got west of the Johnson home. , . . I waited by the side of the hedgerow until I was positive Mr. Johnson was not at home. . . . I went . . . in answer to Mrs. Johnson; . . . she wanted to see me. . . . I saw a man drive out from the Johnson place . . . I concluded it was Johnson leaving home. . . . The lights were on the Johnson car when it left. When I first arrived, I saw Mrs. Johnson standing in the south driveway. We went around to the west side of the house and sat down on the porch. . . . I sat there possibly five or ten minutes. . . . The dog created a disturbance and Mrs. Johnson got up to see what it was. . . . I was sitting on the porch or upper step when Mr. Johnson came around the house and fired at me. He was standing at the southwest corner of the porch. Not a word was spoken by Johnson. Mrs. Johnson said, 'Please don't,' as he passed her. I did not say anything, and did not move. I did not recognize Mr. Johnson. It was too dark. Mr. Johnson was standing about six feet southwest of where I was sitting on the steps when he fired the first shot. After he fired the first shot I did not move; I didn't have time to move. Mr. Johnson stepped perhaps a step closer to me, nearly directly west of me, and was almost in front of me when the second shot was fired. . , . I fell clear down to the ground, and as soon as I could get my gun out of my pocket I fired at him. I could not

say how many times I fired. I think three or four times. I fired twice while I was still on the ground. After I fired twice I got on my feet. I don't know how many times Mr. Johnson fired. Mr. Johnson did not say a word during all this encounter, not one word. I saw the flash of the gun and fired at the form and the flashes. . . . After the last shot was fired there, I went directly west of the house. I left quickly . . . it was the first chance I had to get away . . . I didn't know I hit the man, and I was getting away from there so I wouldn't be overtaken and finished."

Other witnesses called by defendant contributed minor facts in accord with his own testimony, but they added nothing to supply any want in the state's evidence to take the case to the jury.

Did the state make out a prima facie case for the jury's consideration? The jury rejected the defendant's evidence which tended to establish his plea of self-defense. That, of course, was their privilege. But where did that fact leave the state's case against defendant? The state had the burden of proof. The single fact that defendant killed Johnson did not prove that defendant was guilty of murder in the second degree nor of any criminal homicide. The indisputable physical fact, whose significance the state and the jury ignored entirely, was the shooting of defendant by Johnson before defendant shot and instantaneously killed Johnson. What explanation of that highly significant and highly pertinent incident did the state supply? It contented itself by saying to the jury, "Don't believe the defendant's explanation of how this shooting occurred, or how defendant was shot through the back." And yet the trial court quite correctly instructed the jury—

"Before the defendant can be convicted of such offense you must be satisfied from the evidence beyond a reasonable doubt . . . that such killing was committed by the defendant purposely and maliciously.' . . . The defendant is presumed to be innocent until the contrary is proved, innocent of the offense charged and of each and every essential ingredient of said offense."

The state's evidence would have made a complete case of murderous assault on defendant by Johnson; but against defendant it merely proved that after being shot by his assailant he killed him. The lawbooks will be searched in vain for a case which holds that such a killing constitutes murder in the second degree.

The requisite elements to constitute the crime charged, purpose and malice, as stated in the instruction quoted above, were neither established by direct evidence nor by legitimate inference. The burden of proof to make a prima facie case against the defendant was on the state, as in all criminal prosecutions. Since that burden

was not sustained and the requisite evidence not adduced, defendant was under no risk of conviction if he had offered no evidence to show that the shooting of Johnson was an act of self-defense on his part. That he did offer such evidence, and that the jury disbelieved it, did not in the slightest degree supply the want of evidence on the part of the state to prove the crime charged. The opinion of the learned trial court, in ruling on the motion for a new trial, recites the incidents on which the state had to rely for conviction, and the basis for the trial court's approval of the verdict. The court said:

"Well, gentlemen, I have thought about this case a great deal. It is the only case I ever tried in this county, and I came up here without knowing a thing about it. I didn't even know what the case was about when I was called to try it, and I knew none of the parties; . . .

"Now, of course, I realize, just as counsel said, serving a term in the penitentiary, maybe, wouldn't do anybody any special good. A man like Mr. Ridge, at his age and all, and having been always a good citizen, as I understand, and as far as punishing him is concerned, there is probably not very much to be said about it . . . but there is this fact: If crimes are committed and allowed to go unpunished, it (develops) a situation that leads people to distrust their own government, and particularly their courts . . . the jury, of course, was just confronted with the very same thing that I am. They probably hated to return a verdict in this case as they did. . . .

"I realize that there was a very strong case here of self-defense, a very strong case. Mr. Ridge was shot severely, himself, and, of course, that shot, no doubt, was inflicted by the deceased. He couldn't have shot himself very well, and he certainly wouldn't have had anybody else do it in that way purposely, but Mr. Ridge brought the matter on himself, which is very evident. He armed himself that rainy afternoon or evening. He went and bought cartridges for his gun. He walked out to the railroad and up the railroad track that rainy evening. He then waited until he saw the car drive out and away from that place, driving towards town, and all that after he had had the conversation with the deceased in which he had promised that he would not again go about his place. It was just too bad. He did go there, and, of course, just what happened—the jury evidently didn't quite believe the story that the defendant told, or that the wife told, and they didn't have to believe it. They were the judges of the weight of the testimony and the credibility of the witnesses. .No one can take that prerogative away from the jury. After the event had happened and the officers went up to Mr. Ridge's room and told him what had happened, he said something like, 'Maybe it ought to have been the other way.' There was no doubt about the shooting. There was a shooting took place there in which Mr. Ridge took part, and the bullet from his gun, evidently, as found by the examination, went through the brain of the deceased . . .

"As I say, I have a high regard for Mr. Ridge just from what I have seen of him here. I don't believe he is what you would consider a criminal in the

sense that he is committing crimes here and there, but he did bring this upon himself. There is no doubt about that. If he had stayed away from there, and the circumstances under which he went, arming himself before he went, and then waiting until the car left the place there, which he, of course, very frankly testified to himself, he wouldn't be here now asking for a new trial. I know during the trial I admired the frankness with which he stated the occurrence, and, of course, if the matter took place just the way he related it, he should be acquitted; but the jury evidently didn't believe that story, and I can't say but what I believe the jury did the right thing."

Does the opinion of the trial court point out any evidence tending to show that the killing of Johnson was attributable to some criminal wrongdoing of defendant? It says "Mr. Ridge brought the matter on himself." What matter? His getting shot through the back? Perhaps so, but that is not the vital question of present concern. How did he bring about the murder of Johnson, as charged in the information and found by the jury?

True, he armed himself before he went to the Johnson home that night. He gave his explanation why he went armed, but the jury may have discredited that explanation. Johnson, too, was armed that night. Apparently both were "throw-backs" to the age of Indians and cowboys when men were accustomed to carrying weapons—a custom which has happily vanished with the circumstances of pioneer life which excused if it did not justify the practice.

Any invidious inference which might be deduced from the fact that Ridge was armed when he went to the Johnson home dissolves when, as noted by the trial court, Ridge delayed his arrival until he had seen Johnson leave home in his automobile. That evidence tended to show that defendant was prudently trying to avoid a meeting and possible clash with Johnson. Such a course on defendant's part may fairly be characterized as dishonorable, especially after his promise to Johnson made eighteen months or two years previously—that he would never go again to the Johnson home or have any further conversation with Mrs. Johnson. But the breaking of that remote promise did not cause the murder of Johnson. The trial court correctly instructed the jury:

"There has been some evidence introduced concerning the relationship of the defendant and Mrs. Johnson, the wife of the deceased, and in this connection you are instructed that any forbidden visits by defendant to the Johnson home, or conversations between defendant and Mrs. Johnson or any other suspected intimacies of defendant and Mrs. Johnson, would not justify Johnson in taking the law into his own hands. . . .

"The defendant is presumed to be innocent until the contrary is proved, innocent of the offense charged and of each and every essential ingredient of said offense."

Disregarding all the evidence adduced by defendant to show how the affray occurred, the physical facts show that Johnson shot and severely wounded defendant before defendant shot Johnson. Johnson was shot in the forehead, and the state's professional witness, Doctor Kerwood, testified that Johnson's death must have been instantaneous.

Counsel for the state argue quite correctly that since defendant failed to establish his plea of self-defense to the satisfaction of the jury "he fails at the outset." But that point, potent as it often is in ordinary cases of criminal violence, is of no consequence here unless we can say that in the first instance the state made a prima facie case of criminal homicide against this defendant.

Counsel for the state discuss the number of shots which apparently had been exchanged by the combatants, and the range and direction of bullets and bullet holes which pertained to the shooting. But we can deduce no evidence therefrom that the affray which culminated in the death of Johnson was precipitated by defendant and not by Johnson. All the evidence—excluding that of the defense—tended to prove the contrary.

Our attention is called to the remark by defendant as he lay wounded in bed when the sheriff told him Johnson was dead. Defendant said, "It was too bad it wasn't the other way." What did that remark signify? Giving his words their literal meaning defendant regretted that it wasn't Johnson who was lying in bed wounded and suffering, and that he himself had not been killed in the affray. Whatever he meant, his remark was not susceptible of being construed as an admission of any act of wrongdoing pertinent to the crime charged in the information.

It is useless to extend this discussion to further length. A diligent examination of this record fails to reveal sufficient evidence on behalf of the state to take this case to the jury. Defendant's evidence contributed nothing to supply the deficiency in the state's evidence. The result is, defendant's motion for an instructed verdict should have been sustained.

The judgment is reversed and the cause remanded with instructions to discharge the defendant.

WEDELL, J., not sitting.