No. 33,282

THE STATE OF KANSAS, *Appellee,* v. ALBERT M. ZAKOURA, *Appellant.*

(68 P. 2d 11)

Opinion filed May 8, 1937.

*Karl V. Shawver,* of Paola, and *Sam. K. Wasaff,* of San Antonio, Tex., for the appellant.

*Clarence V. Beck,* attorney general, *C. Glenn Morris,* assistant attorney general, *Oliver D. Rinehart,* county attorney, *Robert E. Coughlin, Edward H. Coughlin* and *Andrew Joyce,* all of Paola, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This is an appeal by Albert M. Zakoura, who was convicted and sentenced to hang for the murder of his wife in the city of Paola on Sunday morning, December 1, 1935.

Before considering the errors urged against the judgment, it will be helpful to an understanding of the case to state certain facts antecedent to the tragedy which are contained in the record.

The defendant and his wife were married in Osawatomie in March, 1921. He was then twenty years old; his wife was about sixteen years old. They resided for a time in Osawatomie and then removed to Oklahoma. They returned to Osawatomie, and afterwards sojourned for a time successively in Wichita, Kan., Amarillo, and Borger, Tex. Again they returned to Osawatomie and later took up their abode in Hollis, Okla. In the various localities in which this wandering couple sojourned, defendant worked alternately as a clerk in a store, as a laborer in a railway shop, and as the operator of a café.

In 1935 Mrs. Zakoura, defendant's wife, acquired a business building in Paola and considerable other property by devise or inheritance from a kinsman. There was a second story in the front half of this building, which consisted of a sitting room, two bedrooms and a bathroom. In August, 1935, defendant and his wife and their ten-year-old daughter took up their abode in these living quarters of this building, and they equipped and opened a restaurant on the ground floor.

The long way of the building was north and south. It had a recessed front entrance on the north. At the entrance were two doors, one leading into the restaurant, the other leading upstairs to the family abode.

In the restaurant there were serving shelves along the west wall, and lunch counters, with stools, facing the serving shelves, with a passage between. On the east side of the room were some booths and dining tables. Somewhat more than half the area of the downstairs was thus occupied by the public part of the restaurant. Toward the rear was a partition, behind which was the kitchen, with the usual equipment. In the partition was a serving window, and on its west side was a doorway which permitted easy access between kitchen and restaurant.

In the restaurant proper, but back near the serving window, was a skylight set in the roof of the single-story part of the building, the two-story part constituting the living quarters of the Zakoura family being in the north or front part of the building. There were three windows on the south side of the living quarters, one of them being the family's bathroom window.

Alongside this building on the east was another two-story building, in which, among other arrangements, was a room which served as the lodging quarters of a single man named Harry Cochran, who ate most of his meals in the Zakoura restaurant. In Cochran's room was a window facing west, at a short distance from the bathroom window of the Zakoura family.

In conducting the restaurant, defendant's principal work was that of cook; his wife's main job was that of cashier; three girls served as waitresses, one of whom was Frances Officer. Another employee, Harold Record, served chiefly as dishwasher. The restaurant business required the keeping of late hours, sometimes as late as 1 o'clock a. m., or even later; consequently Mrs. Zakoura was accustomed to sleep until 10 o'clock in the forenoon.

On Sunday morning, December 1, 1935, Frances Officer opened the restaurant about 7 o'clock, and awakened the defendant. He came downstairs and set about the preparation of breakfast. About 8 o'clock he engaged Miss Officer in conversation, and asked her if she had noticed that his wife was treating Harry Cochran "nicer" than she did the other customers. She answered in the negative, and added that "Esther," Mrs. Zakoura, was always congenial and pleasant to all their customers. Defendant replied, insisting that his wife was more friendly to Cochran than to other customers, and that "things showed bad" and "he wasn't going to stand for it." He added that he did not want to make a fool of himself; and asked Miss Officer what she would do in his place. She advised him to speak to his wife.

Coming now to the more immediate incidents of the tragedy, the evidence on behalf of the state tended to show that about 9:30 a. m. Harry Cochran came into the restaurant and ordered his breakfast. Defendant prepared it, and when it was served he sent Harold Record, the dishwasher, to a neighboring grocery on an errand. Then defendant came from the kitchen carrying a revolver, and confronted Cochran. There was only the counter and a distance of 4½ feet between them. Defendant demanded to know what Cochran meant by fooling around with his wife. Cochran replied, "Why, Al!" Defendant forthwith shot Cochran. The latter turned off his stool, stumbled toward the front door, and fell to the floor. Defendant then hastened upstairs to his wife's bedroom, shot her three times, laid down the revolver on a dresser, returned downstairs, lit a cigarette, and awaited the arrival of the police officers.

When the shooting occurred, Record, the dishwasher, called for help. The city marshall was near at hand and came at once. When he arrived and found Cochran shot and dying on the floor he asked, "Who did this?" Zakoura answered, "I did," and added, "There is a woman shot upstairs, too." The sheriff also arrived shortly. He went upstairs and found the woman dead and the bedclothes on fire. He extinguished the fire, and placed the defendant under arrest. On the way to jail the sheriff asked defendant what the killing "was all about?" Defendant answered, "You might know." A brother-in-law of the slain woman saw defendant in jail the same afternoon and said to him, "Albert, what was the big idea? Why in the world did you do such a thing?" Defendant answered, "I just couldn't take it."

The state's evidence also tended to show that Mrs. Zakoura was shot as she lay in bed, probably while asleep.

In due time defendant was given a preliminary examination and bound over for trial on the charge of murder in the first degree for killing his wife.

In the jury trial which followed the state's evidence consisted mainly of the facts stated above, with other details which may require notice as we proceed.

Defendant took the witness stand in his own behalf. He testified that for a considerable time prior to the day of the double homicide he had detected a growing intimacy between his wife and Cochran. They held conversations in a low voice. When he would approach their conversation would break off and Cochran would say, "Well, I must go." Sometimes Cochran would start to leave, but halt at the cigar counter near the front entrance and his conversation with Mrs. Zakoura would be renewed. Defendant testified that on September 16 his wife told him she was going up town to buy a sweaterette, and when she left the restaurant she met Cochran, where they had a short conversation. As time passed these conversations between Mrs. Zakoura and Cochran became more frequent, until on the afternoon of October 23, Mrs. Zakoura told defendant she was going to call on a Mrs. Donovan who operated a beauty parlor. Instead of making this call, Mrs. Zakoura got into Cochran's automobile and rode away with him, and did not return until after 6 o'clock in the evening. Defendant also testified that on another occasion, November 5, he was standing on the street and saw his wife come out of the restaurant and go up the stairway in the build-

ing where Cochran roomed. Defendant waited about 15 minutes and went upstairs to his own apartment and walked into the bathroom, and through the bathroom window and the window of the Cochran room he saw his wife lying on Cochran's bed and Cochran in the act of getting on her. Defendant also testified that on one occasion while standing by the doorway between the restaurant and the kitchen he looked up through the skylight and saw his wife and Cochran talking. He could not hear their conversation but saw their lips moving.

Touching the incidents immediately connected with the shooting, defendant testified, in part, thus:

"I was leaning against the door of the partition between the kitchen and the dining room, with my shoulder against the west part of the door. I glanced up to the skylight. I could see the bathroom of my apartment and the window of the Cochran room. I saw my wife at the bathroom window and I saw Harry Cochran at Cochran's window. I could just see their lips move. I walked out of the café and walked upstairs and I heard a conversation between Harry and my wife. I had walked to about the fourth or fifth stair; the bathroom door was not closed. I heard him say, 'Why don't you get a divorce from him? With what knowledge I have of the oil business and what property you have, we could take it and leave and we could make plenty of money. If the little girl will go with us, all right, but if she don't, we will leave her here and if he won't give a divorce, just leave him to me and I will take care of him.' I walked right down to the café. . . . After I came downstairs I felt that I knew that Harry had accomplished what he had started; that he was going to break up my home; that he was going to take my family away from me; I had heard him threaten me. He sat down about the third or fourth stool. This serving window was open at that time. That pistol was in that holster under that serving window at that time on the shelf directly beneath the serving table. I sat there until he finished his meal, about twenty minutes, and this [serving] window was open all the time, the pistol and holster there all that time, and then I went out to talk to him to tell him to leave my family alone and I said, 'Harry, you can't do this to me. You can't do this to me; ruin my home and child and family.' I never had any intention to kill Harry Cochran at any time. I had this pistol with me because I was scared of him. I had been told that he was an oil-field worker and he was, at times, when he was drunk, a hard man, a bad fellow and I had overheard him say, 'You just leave him to me' and when I spoke to him [about fooling with Mrs. Zakoura], he said, 'Why, Al.' He raised up like this and I thought he was going to kill me; I was afraid of him. I believed my life was in danger at the time. . . after that shot was fired, Cochran started to walk away and I saw he wasn't armed and I didn't shoot any more; I just fired the one shot and then I knew he couldn't hurt me. I didn't know that I had inflicted a mortal wound on Cochran. Then I started upstairs to tell

my wife about what had happened downstairs. I went upstairs to tell my wife about what had happened downstairs and as I got up there, she said, 'What is the matter, Albert?' She was sitting up in bed and I started to tell her about the terrible thing that had happened downstairs and she grappled with me. She took me like that (illustrating) by my hands. I didn't intend to kill my wife; I loved my wife. I don't know how those shots were fired; I don't know whether her hand went against the gun or how it was. We were grappling with the gun and I don't know how it was fired. I had no malice towards my wife. I did not plan to kill my wife and I did not shoot her for revenge. No, I did not shoot her premeditatedly. I did not shoot her; I did not intend to kill her. I did not intend to kill Harry Cochran; I merely tried to protect myself."

The state's rebuttal evidence tended to show that the physical facts touching the range of vision through Zakoura's bathroom window and Cochran's bedroom window were such that persons in position to commit an act of fornication on Cochran's bed could not have been seen. The state's rebuttal testimony also tended to show that it was physically impossible for a person to stand by the doorway between the restaurant and the kitchen and observe persons through the skylight talking, one standing inside the Zakoura bathroom and the other inside the room of Cochran. The state's rebuttal evidence also tended to show that Cochran was not upstairs in the building where he roomed at the time of the conversation defendant testified to, about urging Mrs. Zakoura to get a divorce from her husband, "and if he won't give a divorce, just leave him to me and I will take care of him." On the contrary, the state's rebuttal evidence tended to show that at the time of this alleged conversation Cochran was across the street at a garage working on his automobile; that he worked on it for a considerable time that Sunday morning, and went directly from the place where he was working on his car to the restaurant for his breakfast. The consequence of all this rebuttal testimony, of course, if believed by the jury, was to demolish defendant's evidence that whatever he may have done that Sunday morning (and however unjustifiable in law) was provoked by his wife's infidelity and her seduction by Cochran.

The jury returned a verdict as follows:

"We, the jury impaneled and sworn in the above-entitled cause, do, upon our oaths, find that Albert M. Zakoura, on the first day of December, 1935, was over the age of eighteen years, and we find the defendant guilty of the crime of murder in the first degree, as charged, and we hereby determine that his punishment shall be death, as provided in the laws of Kansas."

The usual post-trial motions were filed and disposed of; sentence

was pronounced and judgment entered; and defendant brings the case here, urging various errors, which will be considered in the order in which they appear in the brief filed in defendant's behalf.

The first point urged is that one of the jurors, C. W. Duncan, had prejudged the case and testified falsely on his *voir dire* in respect to his impartiality. On the motion for a new trial the affidavits of witnesses were read in evidence, which averred that a few days before the trial Duncan was heard to say that he hoped he would get on the jury; he would like to hang the defendant; that he believed him guilty. In two of these affidavits the affiants averred that Duncan had made those disqualifying remarks about 6:30 o'clock on a Saturday evening on a street in Osawatomie. Duncan denied the charge, and although the two affiants were quite positive of the day and hour when the alleged remarks were made they did not give the date. Be that as it may, the state adduced testimony which tended to show that Duncan was accustomed to give a dance on Saturday nights at his farm about seven miles southwest of Osawatomie, and that this custom invariably necessitated his getting home from town long before 6:30 p. m. in order to do his chores and to get the fires going in his barn loft before the dancers arrived. The trial court went into this matter thoroughly, and found as follows:

". . . since the presentation of the motion for a new trial and the motion in arrest of judgment the court has carefully read the record of the *voir dire* in regard to the examination of Mr. Duncan and the court has carefully read and considered all of the affidavit evidence that was presented in the argument for and resisting the motion for a new trial and in arrest of judgment and the court finds and believes from all this evidence, including the oral testimony given in the *voir dire* and the affidavit evidence, that the said juror, C. W. Duncan, is not guilty of the charges urged against him by the defendant, and the court finds and adjudges that the C. W. Duncan was a duly qualified juror and a competent person to sit as a member of the jury panel in the trial of this case."

Under Kansas appellate procedure it is the unvarying practice to sustain the trial court's findings in respect to the qualifications of jurors—for the excellent reason that the presiding judge has a vastly better opportunity to determine the veracity of witnesses on matters of that sort. In *State v. Gardner,* 126 Kan. 803, 271 Pac. 280, it was said:

"In a criminal action, a juror on his *voir dire* answered that he did not know anything about the case and had no opinion concerning the guilt or innocence of the defendant. The truthfulness of those answers was called in question on

the motion for a new trial, and conflicting evidence was introduced concerning whether or not the juror had formed or expressed an opinion concerning the guilt or innocence of the defendant prior to being called as a juror, *held,* that the determination of the trial court that the juror was not disqualified to sit is conclusive on appeal." (Syl. ¶ 1.)

In accord with the case just cited are *State v. Bancroft,* 22 Kan. 170; *State v. Bassnett,* 80 Kan. 392, 102 Pac. 461; *State v. Mc-Lemore,* 99 Kan. 777, 164 Pac. 161; *State v. Henson,* 105 Kan. 581, 587, 185 Pac. 1059; *State v. Brown,* 114 Kan. 452, 219 Pac. 279; *State v. Mendenhall,* 133 Kan. 664, 3 P. 2d 489.

In this case most of the evidence on the question of Duncan's qualifications was in writing, and this court has read the whole of it pro and con with painstaking care; and insofar as the question may be the independent responsibility of this court (*Mathewson v. Campbell,* 91 Kan. 625, 627, 138 Pac. 637), our conclusion is that the charge that Duncan had expressed a desire to be a juror, that he said he would vote to hang the defendant, that he said he knew defendant was guilty, was thoroughly and convincingly disproved in every detail.

Defendant's next complaint relates to the closing argument of counsel for the state. He cites excerpts from that argument such as the following:

"Gentlemen of the jury, as you go to the jury room, think of that little grave down here in that cemetery . . . Let's not forget the sorrowing sisters—let's not forget the sorrowing relatives of the deceased."

The state prints the entire text of the criticized address, and we have read and considered it carefully. As a whole, we think that it contained nothing material which transcended the limits of fair debate. In criminal cases like the one under present review, it is not uncommon that the arguments of counsel may have a touch of "froth and fustian," a few rhetorical flourishes which appear flat, or pointless, and sometimes even silly, when reduced to print and read many months afterwards. Verdicts and judgments are rarely set aside on their account, except where there is reason to believe the remarks of counsel may have prejudiced the defendant. Nothing of the sort appears in this case. (See *State v. Comstock,* 20 Kan. 650; *State v. Miller,* 90 Kan. 230, 133 Pac. 878; *State v. Mullins,* 95 Kan. 280, 303, 147 Pac. 828; *State v. Ice,* 127 Kan. 160, 272 Pac. 110.)

The third objection to the judgment is based on the trial court's failure to instruct the jury on the law of manslaughter. But there

was no evidence to require such an instruction. The evidence cited by defendant to show that it should have been given was his testimony (quoted elsewhere in this opinion) to the effect that Mrs. Zakoura was accidentally shot as she sat up in bed while grasping the hand in which defendant held the revolver. The trial court gave clear and explicit instructions on the law of accidental killing, justifiable homicide, and excusable homicide. In *State v. Kelly*, 131 Kan. 357, 291 Pac. 945, the defendant had been convicted of murder in the second degree. On appeal defendant complained that the court's instructions touching the law of homicide in offenses of less gravity than murder in the first or second degree were not correct. This court said:

"Whether the instructions concerning the various degrees of manslaughter were correct or not, is not now material. It is true the court has held in a number of cases that if there be evidence warranting instructions relating to inferior degrees, such instructions should be given. But, beginning with the case of *State v. Dickson*, 6 Kan. 209 (1870), and extending to the case of *State v. Hardisty*, 121 Kan. 576, 249 Pac. 617 (1926), there are fifteen decisions of this court applying the rule that when instructions complained of relate to a degree of crime inferior to the principal offense charged in the information, and inferior to that of which defendant was convicted, the instructions will be deemed not to have prejudiced the jury, whether correct or not." (p. 363.)

The error predicated on the instructions cannot be sustained.

The next error urged relates to the jury's view of the premises where the double homicide was committed—the restaurant, the skylight, the upstairs bathroom, the bedroom where the woman was shot, and the room where Cochran had his lodging. It is, of course, a familiar practice in this state, and has always had the sanction of positive statute, for the jury in a criminal case to be taken for a view of the *locus in quo*. (G. S. 1935, 62-1818.) It is argued that this particular view would disclose whether or not the range of vision from the restaurant through the skylight was such that defendant's testimony could possibly be true that on that fatal Sunday morning he looked up through the skylight and saw his wife at the Zakoura bathroom window and Cochran at his window and saw their lips moving as if in conversation. Be that as it may, the court explicitly instructed the jury as to the purpose of the view, and admonished it, in part, thus:

"During the inspection, I want to suggest that you will inspect and view the things that are there visible *to be seen and that you are not sent there as detectives to ferret out anything that might be in your minds.* There will be no one there but the jury and the bailiff."

At the time a view was first suggested and before the court made the order permitting it, counsel for defendant objected—

"For the reason it is very highly prejudicial and inflammatory and improper for the court to permit the jury to attend the scene of the tragedy, especially so since it is upon a collateral matter and doesn't tend, in any manner, to elucidate the fact of the killing and would make witnesses out of the jurors and that the request made by the special prosecutor, in open court, in the presence of the jury, is highly improper and the defendant herein wishes to assign such action as error."

This objection was argumentative and unsound, and was properly overruled.

After the jury had viewed the premises and returned to the courtroom, counsel for defendant then made a request that defendant "be permitted to accompany the jury upon the inspection tour of the Ritz Café, the bathroom and bedroom of the Zakoura apartment and the bedroom of the Cochran apartment, and that he accompany the jury during all of said inspection, which inspection has been requested by the state and ordered by the court, over the objection of the said defendant."

This request was properly denied. The presence of defendant with the jury is not required when viewing the premises. (*State v. Adams*, 20 Kan. 311.) Moreover, the request came too late. It should have been made before the jury were sent out to view the premises. Since he made no timely request to accompany the jury, he waived any right he may have had to do so (*State v. Stratton*, 103 Kan. 226, 173 Pac. 300). (See, also, *Snyder v. Massachusetts*, 291 U. S. 97; Anno., View by Jury, Presence of Accused, in 30 A. L. R. 1365 *et seq.*) Furthermore, the record does not show that any prejudice to defendant resulted from the view or from the fact that he did not accompany the jury while making it. (*State v. Harris*, 103 Kan. 347, 175 Pac. 153.)

Defendant next contends that the trial court erred in "permitting the state to show specific acts on the part of defendant in order to tear down defendant's character." The record does not support this complaint. The state offered no such testimony. These "specific acts" got into the record on cross-examination of defendant himself and on cross-examination of his character witnesses, who testified touching their knowledge of defendant's reputation as a peaceable, law-abiding citizen. Such cross-examinations were eminently proper. In *State v. Reuter*, 126 Kan. 565, 268 Pac. 845, it was said:

"In the trial of a criminal action, where the defendant testifies in his own behalf, the question of the extent of his cross-examination for the purpose of testing his memory of matters relating to the charge for which he is on trial and affecting his credibility as a witness, rests largely in the discretion of the trial court, and *held*, in this case we cannot say that such discretion was abused." (Syl. ¶ 3.)

In *State v. McKee*, 131 Kan. 263, 291 Pac. 950, it was said:

"A witness who testifies to the good reputation of the defendant in a criminal action may be cross-examined concerning complaints against him which the witness may have heard prior to the time of his examination." (Syl. ¶ 5.)

The next error is based on the trial court's restriction of the cross-examination of Frances Officer, the young woman who opened the restaurant on the morning of December 1, 1935, and who had the conversation with defendant touching his suspicions of undue intimacy between Mrs. Zakoura and Cochran, and who witnessed the shooting of Cochran and defendant's rapid ascent of the stairs, which was speedily followed by the three shots which killed Mrs. Zakoura. We have patiently studied this record and fail to discern any basis for this complaint. We think the trial court was very patient during the cross-examination of Miss Officer. We can discover no reason for the protracted cross-examination to which she was subjected. The record does not indicate that she was a hostile witness. Indeed, insofar as defendant's defense was predicated on his belief or obsession concerning an undue intimacy between the two victims of defendant's marksmanship that Sunday morning, Miss Officer's testimony of two conversations he had with her on that subject would have tended to favor the defendant rather than the contrary, if any such illicit relationship between Mrs. Zakoura and Cochran would have excused or minimized his crime. But, of course, such a defense has no standing in Kansas law. (*State v. Ridge*, 141 Kan. 60, 65, 40 P. 2d 424; id., 144 Kan. 402, 408, 61 P. 2d 109.) And if it had, defendant could not establish it by cross-examination of the state's witnesses. (Underhill's Criminal Evidence, 4th ed., § 399; 28 R. C. L. 604-605.)

It is finally urged that error was committed in the introduction of a sworn statement made on the day following the homicide in the office of the county attorney. That officer and the sheriff were present, in addition to the notary. The contents of the statement were substantially in accord with the facts of the double killing as given at the trial by the state's witnesses. At the trial there was

no charge that the written statement was not voluntarily made; nor was it contended that it was not an accurate statement of what defendant did say. Neither was it suggested that defendant was promised any leniency to induce him to make the statement. What he did assert at the trial was that he had heard dreadful stories about the practice of the third degree on prisoners, and that he was so scared that he would have signed anything. The record, in part, reads:

"Q. Questions were asked you by the sheriff and the county attorney, weren't they? A. There was.

"Q. . . . They spoke to you kindly, didn't they? A. They didn't speak to me in no gruff voice; no, sir.

"Q. They weren't angry with you, were they, Mr. Zakoura? A. I was just scared. I don't know.

"Q. When this question was asked you, 'State your name,' you knew what it was, didn't you? A. I told you that the reason why—I would have signed anything because I was scared, I told you.

"Q. 'Just tell her [the notary] in your own words'—now, you knew who the 'her' was that referred to, didn't you? A. No, sir.

"Q. Wasn't there a young lady sitting there in that room? A. Yes, sir.

"Q. . . . Why did you tell these gentlemen on that day that you didn't [look at Cochran], huh? A. I tell you, I was scared. I wasn't familiar with the third-degree method they used on prisoners. I was scared.

"Q. Let's have that third-degree method explained, you say these gentlemen used on you. A. I didn't say they used it on me. I said I was scared they would use it on me.

"Q. . . . What influence, if any, did anyone in the room present with you exert upon you to make you answer—to make you give the answer that you made? A. I was scared of them.

"The Court: Have you anything other than that to answer? A. I told you in the beginning I was scared of them, that I would sign anything they put before me."

There are pages of this sort of testimony, but there was no evidence to show coercion, constraint, or promise to induce defendant to make the statement; and no rules of evidence touching its admissibility were breached in the use made of it by the prosecution.

(*State v. Finch,* 71 Kan. 793, 81 Pac. 494; *State v. Campbell,* 73 Kan. 688, 85 Pac. 784; *State v. Hayes,* 106 Kan. 253, 187 Pac. 675; *State v. Pollman,* 109 Kan. 791, 201 Pac. 1101; *State v. Dilgar,* 111 Kan. 794, 208 Pac. 620; *State v. Backstrom,* 117 Kan. 111, 230 Pac. 306; *State v. Demain,* 127 Kan. 716, 275 Pac. 139; *State v. Ralston,* 131 Kan. 138, 139, 289 Pac. 409; *State v. Duvall,* 140 Kan. 456, 36 P. 2d 958.)

And here this opinion must conclude. A diligent and protracted study of the long record discloses nothing approaching the gravity of prejudicial error. The verdict is abundantly sustained by the evidence, and the judgment and sentence are in strict accordance with the statute.

The judgment is therefore affirmed.