No. 26,727.

THE STATE OF KANSAS, *Appellee,* v. FRANK HARDISTY, *Appellant.*

### OPINION DENYING A REHEARING.

Appeal from Osage district court; ROBERT C. HEIZER, judge. Opinion denying a rehearing filed February 12, 1927. (For original opinion of affirmance see 121 Kan. 576.)

*A. E. Crane, B. F. Messick, A. H. Crane, Edward Rooney,* all of Topeka, *A. B. Crum,* of Lyndon, *John J. Riling* and *Edward T. Riling,* both of Lawrence, for the appellant.

*Charles B. Griffith,* attorney-general, *Roland Boynton,* assistant attorney-general, *A. K. Stavely,* county attorney, and *J. J. Schenck,* of Topeka, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The defendant was convicted of murder in the first degree, and appealed. The judgment was affirmed (*State v. Hardisty,* 121 Kan. 576), and now he presents a motion for rehearing on the ground that the decision was contrary to the law and the evidence.

The tragedy was the result of a controversy over the grading of a

Homicide, 29 C. J. pp. 1134 n. 64, 1145 n. 1; 30 C. J. p. 414 n. 79.

road. (For full statement of facts see *State v. Hardisty*, supra.) The defendant again argues the principal questions previously presented and considered. He contends that the circumstances attending the homicide were such that it could not have been murder in the first degree; that it was murder in the second degree or manslaughter, and that the court erred in refusing to instruct the jury on any of the degrees of manslaughter.

We can best present defendant's contention by reproduction of his summing up, which follows:

### DEFENDANT'S CLAIM.

"Frank Hardisty lived on a farm in Osage county, Kansas, through which a public highway was established. It had been graded up from both sides, leaving ditches on both sides of the road. He had constructed crossings for his convenience to cross from the road upon the farms located next to and adjoining the road. On June 9, 1924, he came home in the evening and found that the crossings on the east side of the road had been graded out by the public authorities. He followed them up the road and asked for the boss, and Del Herlan, who was the overseer, replied by saying, "By God, I am; what about it?" They quarreled for a little bit and Herlan called Frank a son-of-a-bitch, which started a fight. Herlan struck first and kicked him. He also told Frank that he would tear out all of the crossings on the west side of the road the next day and Frank said he would be there. That evening Frank called up his attorney about the matter and was referred by him to the county attorney. Frank could not locate the county attorney and he talked with a neighbor by the name of Bryson, who advised him to procure an injunction from a justice of the peace, which Frank did that evening. The order was served on Del Herlan and he paid no attention to it. Frank thought he was complying with the law and was trying to protect his property. He talked some with his wife about it and said he did not intend to let them tear out the crossings. On the next day when he saw the graders coming he took his gun and went up to the gap in the hedge where for more than fifty years the same had been used for ingress and egress to and from the farm. When the graders came near the crossing, Henry Hupp, a life-long friend of his, jumped off the grader and ran or walked rapidly towards Frank. Frank picked up his gun and told him to stop, but he paid no attention to him. He walked right up to Frank, although Frank told him not to do so. He asked Frank what about the crossing and Frank told him to drive around it and everything would be all right. They immediately engaged in a quarrel which continued with only a short intermission until Hupp was killed. In the beginning of the quarrel, Hupp told Hardisty to get the God-damned woman out of there if he did not want to get her hurt, and Frank told him not to hurt her. He told Frank that he intended to tear out the crossing and Frank said he would not. He also told Frank that when Del Herlan came up they would fix him as they were ready for him. Hupp turned around and took two or three steps to the east and met Herlan. They talked for a short

State v. Hardisty.

time and Frank could not hear what they said. After Hupp turned away Frank put the end of the gun to the ground and left it there until Hupp turned around and said: 'You God-damned cowardly son-of-a-bitch, shoot!' and Frank shot and killed him. The evidence shows that Frank was angry, excited, and nervous at the time and beyond question was not in cool blood. The evidence further showed that there was no previous threats or grudges between Frank Hardisty and Hupp. They had been life-long friends. Had it not been for the quarrel and the sudden passion aroused by it, Henry Hupp would not have been shot. On the above state of facts, was the defendant entitled to an instruction on manslaughter? Under the above state of facts, which was not disputed on the trial, would the evidence justify a verdict of murder in the first degree? This court in the opinion did not pass on the case presented to it. Nowhere in the opinion does the court take into consideration the quarrel which occurred between the parties at the time of the killing. Nothing is said about the heat of passion or provocation. In the opinion the court quotes from the testimony of Fred Montgomery. He was not worthy of belief. He swore to a number of things that was denied by every witness present, or they did not see or hear it. The court assumes that he told the truth and everybody else was mistaken. Every witness admits there was a quarrel between them and that the deceased called Hardisty vile names, yet that is given no weight in the opinion."

It has been held that:

"Mere words, however abusive or insulting, will not justify an assault or constitute a sufficient provocation to reduce to manslaughter what would otherwise be murder." (*State v. Buffington,* 71 Kan. 804, 81 Pac. 465. See, also, 29 C. J. 1135.)

Also, that:

"An offense against property does not, in the absence of other circumstances, constitute adequate provocation to reduce an intentional homicide to manslaughter, although there is some authority to the contrary. The rule applies where the homicide was intentionally committed with a deadly weapon, although the trespass or larceny could have been prevented in no other way." (29 C. J. 1145.)

The defendant's statement quoted above omits some controlling essentials. The facts disclosed by the record show clearly provocation was not adequate, nor was there a sufficient degree of passion to reduce the grade of the offense. The defendant testified that when he shot, he shot to kill; that it was not an accident; that he took aim just the same as if he was shooting at anything else than a human being; that he shot right after Hupp dared him to shoot. His wife, on direct examination, answered the double question as to his condition "at the time of the shooting and afterward," that "he was very much excited." On cross-examination she made her meaning clear.

34—122 KAN.

"Q. You say that Hardisty was much excited that day? A. Not till it was all over. When I took the gun he was.

"Q. He was very angry? A. He was not really angry; he was upset and thought they were going to take the rock out.

"Q. He was excited when you took the gun? A. He was excited after it was done.

"Q. He was excited when he took the gun down? A. I did not see him then; I don't know.

"Q. He was somewhat excited the night before? A. No, sir; he said he would be there when they came through; he was not excited.

"Q. He said they were not going through the night before? A. Not that way; he said he would be there when they took them out; that they were not going through the rock."

The defendant made a statement to Deputy Sheriff Allen about an hour after the killing, that he had shot Henry Hupp; that he shot to kill him and not to miss him; that he wanted them to leave the rocks alone; that they were going to move them and that he did not want them moved; that he had told them on yesterday that they could not tear them out and that he wanted to make his word good. He maintains the whole thing happened in five minutes; that there was no time for the blood to cool; and that no jury would be authorized to find him guilty of deliberation and premeditation. This might be true if the only facts in evidence were those stated in his motion, or if all the facts therein stated were supported by the evidence. The court gave due consideration to what defendant terms the quarrel between the defendant and the deceased, but that is not all. The court was and is bound to give due consideration, also, to the trouble of the day before, the attitude and acts of the defendant from that time until after the killing. The first controversy occurred the previous afternoon. It ended in a fight between the defendant and the foreman of the grading crew. Later in the afternoon the defendant endeavored to procure the advice of his attorney; also the county attorney, and subsequently went to a justice of the peace and secured an "injunction" which was served on the foreman. Defendant told his wife and hired man that they (the grading crew) would not take out any more rock; that he would be there and see that they did not go through it. He was advised not to have trouble over the matter. Similar conversation with the same parties occurred the following morning. The contention that he thought he was complying with the law and trying to protect his property by injunction appears not to have been thought of when

he had the conversation with his wife and hired man the night before and the morning of the tragedy. He did not tell them that the injunction would prevent the grading crew from going through, but stated that he would be there and see that they did not go through. If he was depending on the injunction, there was neither reason nor excuse for procuring and taking with him a loaded shotgun. He had determined that the grading crew should not remove the crossings. He knew all of the crew would have a part in their removal. He had no particular member of the crew in mind. He determined to use force if necessary to prevent anyone or all from removing the crossings. For what other purpose did he provide himself with the loaded gun? Having determined on a course of action, he proceeded to put it into execution. He appeared at the crossing at the right time with his loaded weapon. Had he been depending upon his injunction, there was no good reason for him to direct his hired man to come in from his work in the field; there was no reason for having his wife go out and sit on the crossing at the point next the first approach of the graders. In *State v. Kearley*, 26 Kan. 77, 84, it was said:

"It is also clear that the defendant armed himself with the determination of compelling a retraction at the point of a pistol, with all the consequences before him that might follow from a possible refusal. And the question was fairly presented to the jury whether under such circumstances a fatal result should be classed as murder in the first or second degree. Unquestionably the deceased was armed, expecting an affray, and in it, he fired the first shot; but also beyond question, upon the firing of such shot, he turned and fled, was pursued by the defendant and his son, and in the pursuit was killed. There was testimony that as the defendant and his son pursued the deceased, the former called to his son, 'Kill him, God damn him, kill him,' and that as they stood over the fallen body, both father and son fired into it. While under the circumstances the jury might properly have found that the killing, though intentional, was done only in the heat of the affray, we cannot say that they were not also justified in finding, considering the purpose for which the interview was sought, and the previous preparation in the way of arming, that the defendant went there intending to compel a retraction, or to kill if the same was refused. This implies, it may be, only a conditional premeditated intent to take life, and yet such intent is sufficient, if subsequently carried into effect, to make murder in the first degree. We do not understand that in order to constitute this crime, there must be an absolute, unconditional premeditated attempt to take life. If one party seeks an interview with another, arming himself for the encounter, intending deliberately that such other shall do some certain thing, or failing to do that, that he will kill him, such conditional intent is sufficient, if carried into effect, by the homicide of the latter, to

make murder in the first degree. . . . If the deceased had done aught against the laws of the state, the courts were open to punish or restrain; and when the defendant took the law into his own hands and attempted to accomplish by force the righting of his wrongs, or supposed wrongs, he became himself the aggressor, and must take the consequences of all that comes within the probable scope of his intended action."

.    .    .    .    .    .    .    .    .    .    .    .    .    .    . .

"It is earnestly insisted that the law allows 'cooling' time, and that because of the want of this the offense could not be above murder in the second degree. Doubtless this view of counsel would be correct, if the parties had met accidentally, without feeling, without preparation for, or expectation of an affray, but such was not this case. This conviction can be supported only upon the theory that the defendant went to the place of homicide with the thought present in his mind of taking life. There was testimony from which the jury could properly find that such was the fact. To limit their consideration to the mere circumstances of the interview, and to compel them to ignore all that indicated antecedent feeling, would fail to present the case as it truly stood; and to emphasize any particular transaction at the time of the interview, ignoring the circumstances which preceded it would equally present the case in a false light." (p. 87.)

The contention that the court erred in not giving the jury a chance to pass on the question of manslaughter cannot be sustained. It was the duty of the court in instructing the jury to apply the law to the facts as they appeared in the evidence, and to cover every degree of the crime charged of which the evidence naturally suggested the defendant might probably be guilty.

"Where there is no substantial testimony applicable to the lower degrees, and all of it taken together shows the offense, if committed, was clearly of the higher degree, instructions relating to the inferior ones are not necessary." (*State v. Cunningham,* 120 Kan. 430, 431, 243 Pac. 1006. See, also, 16 C. J. 1046.)

It is only where it appears that if the omitted instructions had been given the jury might naturally and probably have convicted of a lesser degree, that the omission will constitute prejudicial error. (*State v. Winters,* 81 Kan. 414, 421, 105 Pac. 516.)

"If the verdict had been for second-degree murder, there would be room to suppose the jurors might have found the defendant guilty of manslaughter only, if the opportunity to do so had been afforded them. But inasmuch as, having a choice between first- and second-degree murder, they elected the former, there is no reasonable probability that they would have returned a verdict of manslaughter if that issue had been submitted to them." (*State v. Hardisty,* 121 Kan. 576, 585.)

We see no reason to change the decision already rendered and a rehearing would serve no useful purpose.

The motion for rehearing is denied.

Mr. Justice Dawson adheres to his dissenting views as stated in the original opinion.