No. 41,665

STATE OF KANSAS, *Appellee,* v. BOBBY JOE SPENCER, *Appellant.*

(349 P. 2d 920)

Opinion filed March 5, 1960.

*Francis J. Donnelly,* of Kansas City, argued the cause and was on the brief for the appellant.

*Robert J. Foster,* County Attorney, and *James P. Davis,* Assistant County Attorney, argued the cause, and *John Anderson, Jr.,* Attorney General, *Robert Hoffman,* Assistant Attorney General, and *Lloyd G. Alvey,* Assistant County Attorney, were with them on the brief for the appellee.

The opinion of the court was delivered by

PRICE, J.: The defendant, Bobby Joe Spencer, was charged with and convicted of murder in the first degree in the killing of Mrs. Rubie S. Blanton. The jury, under the provisions of G. S. 1949, 21-403, fixed his punishment at death. His motion for a new trial was overruled, the verdict of the jury was approved, and he was sentenced to be hanged. This court ordered a stay of execution (G. S. 1949, 62-2414) pending determination of his appeal.

At the outset it should be stated that in his oral statements to the officers, in his signed question-and-answer confession, and on the witness stand, defendant admitted this brutal homicide and at no time denied it. Highly summarized, the record shows the facts to be substantially as follow:

On January 31, 1959, defendant and his companion, Gaither Eugene Crist, arrived in Kansas City, Missouri, by bus from Chicago. The deceased victim, Mrs. Blanton, was a 59-year-old widow, and lived in Kansas City, Kansas. She was employed as a "baby sitter" and also rented rooms in her house. On a previous occasion defendant had rented a room from her. The day after their arrival defendant and Crist went over to Kansas City, Kansas, and rented two rooms from Mrs. Blanton at the rate of $10.00 per week, and made an initial payment of $20.00. They were unemployed and spent the next two or three days around the house. On the morning of February 4th Mrs. Blanton left for her regular work as a baby sitter. Defendant and Crist remained at the house. Some time during the day Crist went into Mrs. Blanton's bedroom and took a .32 revolver from a drawer. Defendant was aware of this.

About six o'clock in the evening Mrs. Blanton returned home from her day's work. She spoke briefly with Crist in the kitchen and then went into her bedroom and stayed a short time. She then came into the dining room and asked defendant where her revolver was. Defendant told her that he did not know. She then went to the telephone and proceeded to dial a number. Defendant went to the kitchen and was handed the revolver by Crist. Defendant then approached Mrs. Blanton who was still at the telephone. He pointed the revolver at her and told her to "hang up." Apparently he was of the opinion that she was calling the police. Upon her refusal to hang up defendant grabbed her and started a scuffle. He hit her on the head with the butt of the

revolver four times. On each occasion the revolver fired but it is not clear whether any of the bullets entered her body. After the fourth blow Mrs. Blanton slumped to the floor.

Crist came in from the kitchen and started to close the venetian blinds in the dining and living rooms. After doing so he opened Mrs. Blanton's purse, which was on the dining-room table, and took from it eight dollars and some odd change. Crist then observed two diamond rings and a wrist watch which Mrs. Blanton was wearing. He removed them from her body. Defendant then told Crist to go upstairs and "start packing." Crist did so. While Crist was out of the room defendant went to the kitchen and secured a butcher knife. He returned to the dining room, where Mrs. Blanton was lying on the floor, and cut her throat from ear to ear. Crist soon came downstairs and after some discussion concerning the situation they carried Mrs. Blanton's body to a raised trap door in the rear of the house and dumped her body down the steps into the basement. They left the house hurriedly by a rear door, hailed a taxicab and directed the driver to take them to the bus station in Kansas City, Missouri. Crist purchased two one-way tickets to New Orleans, Louisiana. They boarded a bus for that destination about nine o'clock that night and arrived in New Orleans early in the morning of February 6th. The following day Crist pawned the two diamond rings at a pawnshop and received a small amount of money and a pawn ticket in return.

At about 2:15 in the morning of February 9th officers Cronin and Hirt, of the New Orleans police department, observed defendant and Crist walking down the street. They were stopped by the officers for "investigation." While they were being questioned Crist had a revolver in his hand hidden by a raincoat. Defendant had a revolver inside his shirt. They were arrested and taken to the police station for further investigation. Upon learning where defendant and Crist were staying in New Orleans their room was immediately searched. The pawn ticket was found, together with a Kansas City newspaper which carried an account of Mrs. Blanton's death. Defendant and Crist, being still in custody, were then questioned further as to their part, if any, in her death. Prior to this questioning they were apprised of their rights and were told that anything they might say could and would be used against them in the event of prosecution. Both defendant and Crist then went ahead and related to the officers the facts of Mrs. Blanton's death, substantially as heretofore related.

The Kansas authorities were notified, whereupon in due course defendant and Crist were returned to Wyandotte county. Following their return each, out of the presence of the other, made a full confession of the entire affair. These were reduced to writing and signed by them, respectively. Prior to the questioning each was advised of his constitutional rights and was told that what he said could and would be used against him.

Subsequently defendant and Crist were charged jointly with murder in the first degree. Being without counsel, the district court appointed Mr. Tudor M. Nellor, a competent member of the Wyandotte county bar, to represent them. Upon Mr. Nellor's application defendant and Crist were examined by a commission of three medical specialists in the field of psychiatry as to the capacity of each to comprehend his position and to stand trial. Following an examination the commission reported that each was sane, able to comprehend his position, and to make his defense. Each was 21 years of age.

No request being made for separate trials, defendant and Crist were tried jointly. Both were found guilty of murder in the first degree as charged, and, as heretofore mentioned, the jury fixed defendant's punishment at death. It fixed Crist's punishment at life imprisonment. Crist is not involved in this appeal.

Included among the evidence at the trial was the testimony of the New Orleans police officers as to the statements made by defendant and Crist during the investigation at that place, and the signed written confessions made by defendant and Crist to the Wyandotte county authorities, the substance of which was identical to the statements made to the New Orleans authorities. In addition, the two diamond rings (which had been redeemed by the Wyandotte county authorities from the New Orleans pawn shop) were identified by witnesses as belonging to Mrs. Blanton. The same is true with respect to identification of the revolver and wrist watch which were stolen from her.

Both Crist and defendant testified in their own behalf and from the witness stand related the facts of the killing, as heretofore set out. They admitted the theft of the revolver, the money from her purse, and of the diamond rings and wrist watch from her person. Defendant admitted that it was he who had slit her throat with the butcher knife while she was lying prone on the floor. Neither Crist nor defendant contended that the statements and confessions

made by them were in any sense of the word "involuntary." In fact, all of the evidence shows, and it was admitted by both Crist and defendant, that their respective statements and confessions were made voluntarily.

Defendant's motion for a new trial was overruled, the verdict of the jury was approved by the trial court, and defendant was sentenced to be hanged. His court-appointed counsel filed and served a notice of appeal and then requested permission to withdraw from the case. Such request was granted, whereupon the trial court appointed Mr. Francis J. Donnelly, a competent member of the Wyandotte county bar to represent defendant in his appeal. Mr. Donnelly has done so.

Although defendant appealed from the order overruling his motion for a new trial, that ruling is not included in his specifications of error. Such being the case, literal adherence to the rule respecting appellate review would preclude review of alleged trial errors such as questions relating to instructions and admissibility of evidence. (*State v. Turner,* 183 Kan. 496, syl. 1, p. 500, 328 P. 2d 733 — appeal dismissed, 359 U. S. 206, 3 L. Ed. 2d 759, 79 S. Ct. 739, and *State v. Hamilton,* 185 Kan. 101, 340 P. 2d 390, cert. denied 361 U. S. 920, 4 L. Ed. 2d 188, 80 S. Ct. 265.) Because of the nature of this case and the sentence imposed, however, we have carefully examined all contentions made and will discuss them briefly.

Citing *State v. Ryan,* 137 Kan. 733, 22 P. 2d 418, it is contended that it was error to allow the county attorney to conduct the prosecution and also to testify as a witness for the state. In that case it was held:

"Where it is necessary for the counsel in a case to testify on some material disputed point that has a material bearing on the guilt or innocence of the defendant in a criminal case or one that involves a serious dispute of fact in a civil case, he should withdraw as counsel in the case." (syl. 2.)

In the Ryan case it appears that the county attorney testified as to a statement defendant had made to him and continued to act as counsel for the state. The statement in question was an important part of the state's case and had a marked bearing on the question of the plea of self-defense and tended to contradict in some particular the evidence of defendant as given from the witness stand. We adhere to the rule just stated, but it has no application to the facts before us. Here the county attorney was one of the officers who went to New Orleans to apprehend Crist and the defendant.

Upon his arrival there he was given the pawnshop ticket which was found in their room. In the presence of a New Orleans officer he redeemed the diamond rings which had been stolen from Mrs. Blanton and returned them to Wyandotte county where they were locked in a safe under his care, custody and supervision. He testified as to this transaction merely to supply the link in the chain of events leading to the redemption of the rings and their subsequent introduction in evidence. His testimony in no way contradicted defendant's evidence and, in fact, merely corroborated that which defendant already had admitted. Defendant at no time denied that the rings were stolen from the victim and pawned in New Orleans—he admitted it. Furthermore, the record shows no objection was made to this testimony of the county attorney.

It is contended that it was error to permit the introduction of photographs of the deceased victim taken at the mortuary by the police department. It appears that one of the photographs was introduced for the purpose of identification of the deceased by a witness who had known her for a number of years, and that others were used for the purpose of enabling the jury to visualize the wounds on the head of deceased described by a pathologist witness. They also were introduced for the purpose of corroborating the statements by defendant that he had struck the deceased on the head with the revolver which had been stolen from her room. It is contended the photographs were "gruesome" and tended to inflame the jury. It must be remembered that the facts of this case established a gruesome and shocking killing and, under the circumstances, the introduction of the photographs was not error. (*The State v. King,* 111 Kan. 140, syl. 7, p. 152, 206 Pac. 883, 22 A. L. R. 1006.)

Although it appears that at the trial no objection was made to any of the instructions given, and that none requested, if any, were refused, defendant now contends the trial court erred in instructing the jury in such a manner on lesser offenses as to require a finding of the element of murder in the first degree in order to convict on a lesser degree or manslaughter.

The jury was instructed on murder in the first and second degrees and on manslaughter in the first, second and third degrees. Under the evidence in this case it is very doubtful that it would have been error to have refused to instruct on any of the degrees of manslaughter. Further, the defendant having been charged with mur-

der in the first degree, and having been convicted of that charge, the correctness of instructions relating to manslaughter becomes immaterial. (*The State v. Clough,* 70 Kan. 510, syl. 1, 79 Pac. 117; *State v. Hardisty,* 121 Kan. 576, 584, 249 Pac. 617, opinion denying a rehearing, 122 Kan. 527, 532, 253 Pac. 615; *State v. Kelly,* 131 Kan. 357, syl. 1, pp. 363, 364, 291 Pac. 945; *State v. Zakoura,* 145 Kan. 804, 811, 812, 68 P. 2d 11; *State v. Hockett,* 172 Kan. 1, 238 P. 2d 539; *State v. Mitchell,* 181 Kan. 193, 198, 199, 310 P. 2d 1063, and *State v. Robinson,* 182 Kan. 505, 510, 322 P. 2d 767.) We find no merit in defendant's contention.

Although his brief raises the question whether the oral and written confessions introduced in evidence were voluntary, counsel for defendant at the oral argument of this appeal frankly conceded that the point was being abandoned as without merit. Even though the question were now urged, the record contains absolutely nothing to support it. In fact, all the evidence clearly establishes the voluntary character of the oral and written confessions, and defendant does not contend otherwise. He took the witness stand and admitted everything.

While testifying in his own behalf he related some of his past life. His parents died when he was 13. He had seven brothers and sisters and three half-brothers and sisters. He lived with his oldest sister for a time and then was placed in a Children's Baptist Home. He ran away from there frequently, stole an automobile, and was sent to a "juvenile camp" for four months. He then lived with an older brother and later spent time in a reformatory. Eventually he joined the navy, went AWOL several times, and finally was given an "undesirable discharge" at age 18. He then went to live with an older sister in California and worked as a pipe inspector for an oil company. He and his brother-in-law had rented a room from Mrs. Blanton and lived there for three weeks in February, 1958, and "got along with her all right." He later worked in Washington, D. C., and Chicago, and returned to Kansas City on January 31, 1959, to seek employment. The tragic events of the next few days have already been related.

Examination of this record discloses that throughout the trial defendant's rights were safeguarded and protected in every respect. No error being shown, the judgment of the trial court must be and is affirmed.