Nos. 44,901 and 45,097

STATE OF KANSAS, *Appellee,* v. KENNETH L. KILPATRICK, *Appellant.*

(439 P. 2d 99)

Opinion filed April 6, 1968.

*Ralph J. Thorne,* of Hutchinson, argued the cause and was on the brief for the appellant.

*Richard J. Rome,* County Attorney, argued the cause, and *Robert C. Londer-holm,* Attorney General, *Raymond F. Berkley* and *Charles E. Orcutt,* Assistant County Attorneys, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from a conviction of first degree murder and forcible rape in the district court of Reno County, Kansas. The defendant pleaded guilty to the charges and was given the death sentence by the trial judge pursuant to K. S. A. 21-403.

Although the appellant entered a plea of guilty to each of the charges in the information he raises points commencing with the refusal of the trial court to grant his petition for change of venue. After stating the facts the various points relied upon by the appellant will be reviewed in order.

The appellant's abstract of the record on appeal sets forth a "Stipulation of Testimony and Agreed Statement of Evidence and Facts" entered into by counsel for the respective parties. The counter abstract presented by the state sets forth, among other things, the verbatim testimony of various witnesses heard by the trial court prior to the pronouncement of sentence. The facts taken from the agreed statement may be summarized as follows:

Kenneth Kilpatrick (defendant-appellant) was charged with forcible rape and first degree murder committed upon Linda Callender on the 12th day of June, 1966. On the 14th day of November, 1966, the defendant entered his plea of not guilty to the charges, and the case was called for trial. After placing 135 persons as prospective jurors under *voir dire* examination, 36 were impaneled and passed for cause over the defendant's objection. Peremptory challenges were exercised and a jury of 12 was duly sworn to try the case on the 19th day of November, 1966.

Out of the presence of the jury, the defendant then announced his intention to enter a plea of guilty to each of the charges in the information. He thereupon entered a plea of guilty to the charge of forcible rape and was sentenced to the Kansas State Penitentiary for not less than five nor more than twenty-one years pursuant to K. S. A. 21-424, as modified by K. S. A. 1967 Supp. 62-2239. Thereafter the defendant entered a plea of guilty to the charge of first degree murder. Evidence was presented to the trial court pursuant to K. S. A. 21-403 which commenced on the 19th day of November, 1966, and continued until the 21st day of November, 1966. The defendant's evidence was presented to the court on the 22nd day of November, 1966.

On the 25th day of November, 1966, the trial judge sentenced the defendant to suffer the death penalty.

The evidence discloses that the defendant and one Ronald Warrick had been friends for about three years. Approximately one year prior to the offenses charged herein Warrick had an altercation with the defendant and had beaten him badly. On the afternoon of June 11, 1966, Warrick and the defendant had been together for a while at the defendant's home working on Warrick's automobile. Later that evening, around 9 p. m., Warrick met the defendant in a beer tavern known as the Silver Dollar located on West 5th Avenue in the city of Hutchinson, Kansas. They talked and drank beer from the time they met until approximately 12:00 p. m. While they were in the tavern Linda Callender, who was seventeen years of age, came into the tavern with her sister and two boys. They all drank beer. Linda Callender was dressed in brief shorts and a top, and while she was there did some dancing with her sister. Linda Callender left the tavern with another boy between 11:30 and 12:00 p. m. At about midnight on June 11, 1966, the defendant and Warrick left the tavern in the defendant's automobile, a 1957 Plymouth station wagon, and went to Linda Callender's home on West Avenue "A" in Hutchinson, Kansas. Warrick went to the door of the Callender home and asked Linda if she wanted to go with the defendant. As to this point Warrick testified as follows:

"I got out of the car and went to the door and knocked on the door and Linda Callender came to the door, and I asked her if she wanted to go out with Kenneth Kilpatrick and she said yes, and she said just a minute, and she went in and got something, she said she didn't want her mother to know she was going out this time of the night, and she got in the car and we went out to the Wharf Club."

The three spent some time trying to get into the Wharf Club, which is a night club, but because Linda was seventeen years of age she was not admitted. The three then went to another location in Hutchinson on Second Street in an attempt to get some liquor, but were unsuccessful. Thereafter they went to a salvage yard operated by the defendant's father where the defendant located some liquor. The three drank the contents of the bottle, not quite a full half pint, each drinking part of it. Linda wanted to go home but the defendant drove south of Hutchinson and stopped his automobile. There the defendant held Linda's hands and Warrick ripped off her clothing and raped her. Then Warrick held Linda's hands and the defendant had intercourse with her. This occurred in the front seat of the defendant's automobile. As to the foregoing activity Warrick testified:

"Q. And when (the defendant) got finished what happened?

"A. He got up and set up and put his clothes on, and she put her clothes on, and he started the car up and she said she was going to holler rape.

"Q. She said she was going to holler rape?

"A. She said she was going to holler rape on us, and I asked her why."

The defendant then drove to an eating establishment on South Main in Hutchinson, and Warrick went in to get a piece of paper on which Linda was told to write that she had not been raped. Linda took the paper and pencil and wrote on it that Ronald Warrick and Kenneth Kilpatrick "raped me on the 11th day of June, 1966." The defendant started the car up again and drove out into the country southeast of Hutchinson, and after some discussion about having to kill Linda, the defendant opened the door, grabbed her and yanked her out of the car by the neck. She fell to the ground where she lay without moving. The defendant listened to her heart, took out his pocket knife and stabbed her in the heart area. They left Linda by the roadside and went back into town with the defendant driving. They procured a shovel and returned to the place where the body had been left. Both the defendant and Warrick picked up the body, placed it into the back of the station wagon, and covered it with a seat cover. The defendant then drove west on Highway 50 to the Arkansas River bridge near Hutchinson, up a dirt road north of Highway 50 along the Arkansas River where they parked. The defendant dug a shallow grave and Warrick dragged the body for some distance to the grave. The defendant then threw the body into the grave head first and physically forced the body into the grave. Warrick covered the body with dirt. At

the time Warrick was dragging the body he saw that Linda's throat had been cut.

Warrick testified he went along with these activities because he was afraid of the defendant, and that the defendant would kill him if he didn't. The defendant wanted Warrick to go to Mexico with him and threatened him if he would not.

On Sunday, the 12th day of June, 1966, at about 10 o'clock in the evening, Warrick turned himself in to the police station at the urging of his wife. His testimony concerning this is as follows:

"She wanted me to turn myself in right then, and I wanted to in a way, but I was scared, scared if I turned myself in that Kilpatrick might find out that I turned myself in or something and would get back at me some way, and I was scared. I knew that I was involved with it, and I knew that I might hang."

After some conversation with the police officers at the Hutchinson police station, the sheriff of Reno County was summoned and Warrick was interrogated by the undersheriff, Walter J. Hillman. The undersheriff talked with Warrick and his wife for some time, and it was not until Warrick told the undersheriff that he had sexual relations with Linda that the undersheriff advised Warrick of his rights. He did not at any time or at any time thereafter advise Warrick that he could have an attorney, or that an attorney would be provided for him.

After some time at the Hutchinson police station Warrick led the officers to the gravesite of Linda, where she was removed, examined by the coroner and taken to a funeral home in Hutchinson. While the body was being exhumed certain pictures were taken that were later introduced in evidence over the objection of the defendant. Other pictures were taken of the body at the mortuary which were also introduced in evidence over the objection of the defendant.

Following the removal of the body Warrick then directed the officers to the location where the death occurred. There additional pictures were taken and put in evidence over the defendant's objection.

On the 13th day of June, 1966, the defendant was arrested and charged with first degree murder and the forcible rape of Linda Callender. Warrick was similarly charged with first degree murder and forcible rape on the same date.

Prior to the trial of the defendant the charges against Warrick were reduced to statutory rape and to accessory after the fact of

murder. Warrick pleaded guilty to these reduced charges and was sentenced to the Kansas State Reformatory at Hutchinson, Kansas.

The autopsy performed on the body of Linda Callender by a pathologist revealed that the left chest of Linda had a total of six knife stab wounds and a large gaping defect at the anterior neck, which extended from one earlobe to the other, with the defect being very deep and extending down to the bone. This apparently had been caused by a sharp instrument such as a knife, and caused a complete transection of the main artery on the left, as well as the trachea and esophagus. There was also found a fracturation of the neck at the left of the fourth vertebra. In the pathologist's opinion the immediate cause of Linda's death was aspiration of blood through the lungs, with several potential causes of death. The stab wounds to the heart definitely would have been fatal within a few minutes. The injury to the neck was absolutely fatal as there were severe transection injuries to the trachea and the esophagus. In the pathologist's opinion the girl's neck was broken by brutal force—a sharp pull of the neck.

The pathologist's examination of Linda's body for possible rape disclosed no evidence of injury, but he found the presence of spermatozoa in her vaginal secretion. He also examined scrapings from the automobile of the defendant, tests of which disclosed the presence of human blood.

On the 14th day of September, 1966, a petition was filed for the appointment of a commission to determine the sanity of the defendant, and pursuant thereto a commission of three doctors was appointed on the 27th day of September, 1966. They made their report on the 4th day of October finding the defendant sane and able to comprehend his position and to make his defense.

One of these doctors, a psychiatrist, was called to testify. He stated that he had given the defendant an examination on the 28th day of October, 1966, which consumed the whole day. The defendant was given psychological and mental tests as to the state of his mental functioning. The tests consisted of X-rays of the skull, a brain scan, psychological tests, a social history, and also medical history. He testified the tests for brain malfunction, or brain disease, were entirely negative with no signs whatever. The tests used to examine the defendant were the Shipley-Institute of Living Scale for Measuring Intellectual Impairment, the Wechsler Adult Intelligence Scale, the Minnesota Multiphasic Personality Inventory, the

Interpersonal Check List, the Thematic Apperception Test and the Rorschach Test.

A detailed report was set forth in the record of the defendant's social history taken by a psychiatric social worker under the direction of the psychiatrist who testified. The psychiatrist then testified:

"A. He is a man of below average in intelligence, between dull normal and border line defective.

"Q. What would his mental age be?

"A. His mental age would be between 12 and 13 years of age.

"Q. Have you an opinion as to why it was only at this level?

"A. This would be partly due to inheritance, and partly due to the lack of adequate relation in his environment.

"Q. Would this be lack of stimulation from his parents and others?

"A. Yes.

"Q. All right, go ahead.

"A. He showed himself as being without any evidence of mental illness, but a very passive, weak and submissive individual, who, when he is not drinking, assumes a rather passive and inhibited role where he is afraid of asserting himself in situations with both females and males. He can be physically aggressive and destructive towards others, but can never assume a frank, assertive situation with others when he feels he is equal to the other. He drinks in order to feel strong and assertive, and when drinking he has need to make the other people feel as he does, that is, weak, helpless and afraid.

"Q. Doctor, could he be easily led into things by other persons?

"A. Yes, I would think he could, quite easily.

"Q. And how would they do this?

"A. Probably by taunting or goading him. It is rather difficult to know how they would go about it, but there are many ways that they could.

"Q. Is that the extent of that, your evaluation of this young man?

"A. That about summarizes it, except for the diagnosis which completes it from our standpoint, anyway. He is a pseudo-psychopathic personality with a schizophrenic underlay.

"Q. Perhaps you better explain that.

"A. The psychopathic personality is one who tends to solve his problems by direct action against the environment of society, rather than thinking through a problem. The schizophrenic is popularly called split-personality but this is dormant in him. He is not psychotic, but there is a possibility that under certain conditions he might become so, and he is rather afraid that he might, and tends to drink and act out as a way of defending against this.

"(The tests showed that the Defendant had an I. Q. 23 to 24% below normal.)

"Q. And will he strike out if he is in a corner?

"A. This is his tendency, yes.

"Q. How do you explain Mr. Kilpatrick's commission of an act that he is charged with here, that he has pleaded guilty to, the commission of this murder?

"A. I can't explain it except to say that from these psychological findings, I would say that he was in some kind of a panic at the time, cornered, scared."

The defendant's mother testified that her husband, the father of

the defendant, was in a mental institution in 1952 at Fort Supply, Oklahoma, and had remained there for a period of fourteen months.

In argument presented by counsel for the state to the trial court, counsel stated he had a personal conviction about capital punishment—that he did not believe in it. He recommended a life sentence to the penitentiary.

The appellant says in his brief this case involves an examination of the Kansas law with respect to capital punishment following a plea of guilty by the defendant. Various arguments made by the appellant in his brief, however, attempt to reach beyond this point.

The first contention advanced by the appellant is that the trial court erred in refusing his petition for change of venue. It is argued the trial court heard the *voir dire* examination of 135 people who had been called to serve as prospective jurors, not one of whom, it is said, was unfamiliar with the case. He argues they knew of the parties in a general way, and all had read in the papers or heard on the radio about the "confession" of Warrick and the "confession" of the appellant. Although not contained in the record, it is said at the hearing on the petition of the appellant to change venue, newspaper articles and copies of radio broadcasts were presented to the court for consideration. The appellant argues, therefore, the trial judge was unaware of the fact that he would be called upon to decide the penalty to be imposed on the murder charge until the plea was entered. It is said an awesome atmosphere prevailed in the courtroom for nearly a week in the questioning of citizens of the community as to their knowledge of the commission of the crime and the facts surrounding it.

The appellant argues that under these circumstances the trial judge was influenced by what had taken place, and he could not consider the evidence with an open mind and without some degree of prejudging. On this point the appellant relies upon the Sixth Amendment to the United States Constitution and upon Section 10 of the Bill of Rights of the Kansas Constitution which guarantee the accused an impartial trial.

The case of *State v. Latham & York,* 190 Kan. 411, 375 P. 2d 788, cert. den. 373 U. S. 919, 10 L. Ed. 2d 418, 83 S. Ct. 1310, is relied upon by the appellant. There a change of venue was granted on the ground that articles had appeared in three different newspapers. Here the trial court refused to provide a transcript of the proceedings that preceded the plea of guilty, after the appellant requested to have such transcript prepared.

The appellant's argument that the refusal of the trial court to change venue prevented a fair and impartial trial is not well taken. Here the accused entered a voluntary plea of guilty to each of the charges. This is a confession of guilt of each of the crimes charged and every fact alleged. It is legally the most formal and binding confession possible for an accused to make. (*State v. Downs*, 185 Kan. 168, 341 P. 2d 957; *Dexter v. Crouse*, 192 Kan. 151, 386 P. 2d 263; and *Wagner v. State*, 199 Kan. 154, 427 P. 2d 495.)

Where a person accused of crime enters a plea of guilty upon his arraignment, he is deemed to have waived irregularities which may have occurred in the proceeding prior thereto. It has repeatedly been held any so-called "irregularity" pertaining to a preliminary examination is deemed to have been waived where a defendant in a criminal proceeding enters a voluntary plea of guilty in the trial court. (*State v. Blacksmith*, 194 Kan. 643, 400 P. 2d 743; *State v. Talbert*, 195 Kan. 149, 402 P. 2d 810, cert. den. 382 U. S. 868, 15 L. Ed. 2d 107, 86 S. Ct. 143; *Blacksmith v. State*, 195 Kan. 523, 407 P. 2d 486; and *Cleveland v. State*, 195 Kan. 544, 407 P. 2d 488.) The same rule applies here, if it can be said any irregularities occurred prior to the appellant's entry of a plea of guilty to each of the charges.

Where the accused in a criminal case enters a plea of guilty to the charges against him, the proceedings have passed the stage of ascertaining his guilt or innocence, and safeguards written into the federal and state constitutions assuring one accused of crime of a fair and impartial trial are no longer applicable. Therefore, cases such as *State v. Latham & York*, supra; *In re Hedrick Appeals*, 155 Kan. 165, 123 P. 2d 806; and *State v. Turner*, 193 Kan. 189, 392 P. 2d 863, have no application to the facts herein.

Where, as here, the accused in a criminal action has entered a plea of guilty to the charges against him, after having been fully apprised of his rights in the presence of his counsel, the trial court cannot be prejudiced in matters respecting the accused's guilt or innocence. The accused has already admitted his guilt.

Where a plea of guilty is entered to a charge of murder in the first degree, it is the duty of the court under K. S. A. 21-403 to determine whether the accused shall be punished by death, or by confinement and hard labor in the penitentiary of the state of Kansas for life. Under these circumstances the provisions of 21-403, *supra*, require the trial judge to hear evidence in making the determination as to which punishment shall be inflicted.

The provisions of K. S. A. 62-1319 pertaining to a change of venue are not applicable to the foregoing situation. If the trial judge does not feel he is qualified to determine the sentence in a given murder case before him, it is his duty to disqualify and another judge will be called upon to determine the matter. Absent a disqualification by the trial judge who is called upon to determine the matter, or absent an affirmative showing in the record that the trial judge is disqualified or prejudiced in the matter, it must be assumed the trial judge is qualified to determine which sentence to invoke in a murder case upon the evidence presented in the case.

Second, the appellant contends the trial court erred in allowing the admission of evidence secured by the unlawful confession of Ronald Warrick, an accomplice of the appellant.

On this point the appellant contends the confession taken from Warrick in the police station was taken without the procedural safeguards required by *Miranda v. Arizona,* 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). It is argued the confession made by Warrick led to all the evidence against the appellant. Warrick took the officers to the site of the crime, the place of the burial, and all the pictures taken, evidence secured, and facts ascertained from an examination of the body of Linda Callender arose out of the confession of Warrick. It is argued Warrick was initially charged with first degree murder and forcible rape, and that none of this evidence could have been used to convict him. The county attorney chose to reduce the charges against Warrick as a result of which he testified in the instant case.

The substance of the appellant's argument is that inasmuch as the confession of Warrick was illegally obtained, all evidence against the appellant was the fruit of a poison tree, citing *Mapp v. Ohio,* 367 U. S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961).

Here again the attack tends to challenge the issue of the appellant's guilt or innocence. This, however, has been established by his plea of guilty.

We find it unnecessary to determine on the facts in this case whether the statements made by Warrick to the undersheriff of Reno County constituted an illegal confession under *Miranda v. Arizona,* supra. The confession made by Warrick was not used in evidence against the appellant because Warrick testified in person, not on the issue of the appellant's guilt or innocence, but in supplying evidence upon which the trial court was to determine which punishment was to be invoked.

We find no merit whatever in the appellant's contention on this point.

Third, the appellant contends the trial court erred in admitting into evidence color pictures and color slides of the victim. It is argued the only purpose for which the pictures could be introduced was to show a horrible scene and inflame the trier of the facts. We again note the trial court was not called upon to try the facts concerning the issue of the appellant's guilt or innocence. Here the photographs were introduced to show the identity of the victim and to corroborate the statements made by Warrick and the appellant. Even had these photographs been introduced in evidence upon the issue of the appellant's guilt or innocence, they would have been proper because they were relevant and material to the matters at issue and were not rendered inadmissible merely because they may have been shocking or gruesome. (*State v. Spencer*, 186 Kan. 298, 349 P. 2d 920; and *State v. Hill*, 193 Kan. 512, 394 P. 2d 106.)

Fourth, the appellant contends the trial court erred in assessing the death penalty which was contrary to the recommendation of the county attorney, the assistant county attorney and the sheriff of Reno County. Under these circumstances it is argued it was an abuse of discretion for the trial court to assess the death penalty in the instant case.

We find this position of the appellant untenable. The Kansas law does not give the state's attorney the right to determine which punishment shall be inflicted upon a conviction of murder in the first degree. Where a plea of guilty is entered, as here, the provisions of K. S. A. 21-403 clearly place the responsibility upon the trial judge who is required to hear evidence in making the determination as to which punishment shall be inflicted.

Fifth, the appellant contends he was not afforded equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution. His argument on this point stems from the fact that the county attorney dismissed the original charges of first degree murder and forcible rape filed against Warrick by reducing the charges to statutory rape and to accessory after the fact of murder. The argument proceeds on the assumption that the county attorney also had the power to reduce the charges against this appellant, and could have charged him with lesser offenses. The county attorney, however, chose to reduce the charges as to Warrick in order to prosecute the charges against the appellant.

This, it is contended, did not apply equal protection of the laws as guaranteed by the Constitution of the United States to these parties, both of whom were involved in the murder. The appellant cites no authorities to support his proposition.

The county attorney is the representative of the state in criminal prosecutions, and as such he controls these prosecutions. He has the authority to dismiss any charge or to reduce any charge. He can prosecute against one defendant if he so chooses, and he can decide not to prosecute against another defendant. (See, *State v. Wilson*, 24 Kan. 189; *State v. Wells*, 54 Kan. 161, 37 Pac. 1005; *State v. Snelling*, 71 Kan. 499, 80 Pac. 966; *In re Broadhead*, 74 Kan. 401, 86 Pac. 458; *Foley v. Ham*, 102 Kan. 66, 169 Pac. 183; and *State, ex rel., v. Court of Coffeyville*, 123 Kan. 774, 256 Pac. 804.)

The equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution does not embrace the situation here presented.

Sixth, counsel for the appellant contends the trial court erred in assessing the death penalty where the evidence disclosed the appellant had a mental age of twelve to thirteen years. Counsel for the appellant contends the testimony and the evidence is unchallenged that Kenneth L. Kilpatrick, the appellant, had a mental age of twelve to thirteen years at the time of the commission of the crimes herein charged. It is argued that as a matter of law the trial court should have given him a life sentence on his plea of guilty to first degree murder, rather than the death penalty.

K. S. A. 21-403 has a proviso which reads:

". . . That the death penalty shall not be inflicted, either by the jury or by the court, upon any person who was under the age of eighteen years at the time the crime was committed. . . ."

The appellant argues that a criminal statute must be strictly construed against the state and in favor of the accused. (Citing, *State v. Bowser*, 158 Kan. 12, 145 P. 2d 135; *State v. Bishop*, 160 Kan. 233, 160 P. 2d 658; and *State, ex rel., v. American Savings Stamp Co.*, 194 Kan. 297, 398 P. 2d 1011.) He further relies on the proposition that exceptions in criminal statutes are to be construed liberally in favor of one charged with their violation. (Citing, *State v. Hill*, 189 Kan. 403, 369 P. 2d 365, 91 A. L. R. 2d 750.) Counsel for the appellant says nowhere has he been able to find the definition of "age" in the reports of the Kansas Supreme Court, and he argues that the legislature was certainly thinking about persons of tender

years not being subjected to hanging by the neck until dead. He urges that reason would lead us to believe the legislature intended people of mental age under eighteen years should not receive the death penalty. Counsel for the appellant reminds us of the fact that the appellant had only the mind of a normal twelve to thirteen year old child.

The facts in the instant case disclose the appellant was twenty years of age at the time he killed Linda Callender. He thus qualifies as one of the persons eligible under Kansas law to receive the maximum penalty of death by hanging. The legislature, by referring to the age of a person at the time the crime was committed, definitely had in mind chronological age and not mental age. Had the legislature intended mental age in 21-403, *supra*, it would have said so. The practical application of a statute, such as this, based upon mental age, would be almost impossible.

Counsel for the appellant in his brief indicates the foregoing point is the most significant one in the appellant's appeal challenging capital punishment.

Seventh, the appellant contends the death penalty as carried out in Kansas is cruel and unusual, and thus unconstitutional, citing Section 9 of the Bill of Rights of the Kansas Constitution and the Eighth Amendment to the United States Constitution. It is argued hanging by the neck is an unusual punishment, and that it is cruel punishment. It is argued:

"The manner in which the State of Kansas exercises Capital Punishment in the dark of the night, on a roughly made scaffold, in a building some people refer to as a shed within the walls of the Lansing Penitentiary, with all except a few witnesses excluded from the view of the same as provided under K. S. A. 62-2401, 62-2402, and 62-2403, is cruel under modern standards. It smacks of 'frontier justice'."

It is said reasonable men would not differ in declaring the method that Kansas employs to legally kill people to be cruel if employed by a citizen.

The manner of inflicting the death penalty is a matter for the legislature of the state of Kansas to decide. The legislature has chosen to prescribe hanging by the neck as a means of execution in Kansas, and it is not for this court to determine the wisdom of that decree.

The appellant cites no cases to back his proposition that hanging is a cruel and unusual punishment under the Constitution of Kansas

or the Constitution of the United States. The matter was discussed in *State v. Latham & York*, supra.

The prohibition of the Eighth Amendment does not forbid capital punishment by presently authorized methods, such as by hanging, shooting, electrocution or gas. (*In re Kemmler*, 136 U. S. 436, 34 L. Ed. 519, 10 S. Ct. 930 [1889]; *Dutton v. State*, 123 Md. 373, 91 Atl. 417 [1914]; and *Territory v. Ketchum*, 10 N. M. 718, 65 Pac. 169 [1901].) The United States Supreme Court has upheld every method of execution—electrocution (*In re Kemmler*, supra; and *State v. Burdette*, 135 W. Va. 312, 63 S. E. 2d 69 [1951]); hanging (*Dutton v. State*, supra); shooting (*Wilkerson v. Utah*, 99 U. S. 130, 25 L. Ed. 345 [1878]); and lethal gas (*State v. Jon*, 46 Nev. 418, 211 Pac. 676, 30 A. L. R. 1443 [1923]; and *People v. Daugherty*, 40 Cal. 2d 876, 256 P. 2d 911 [1953], cert. den. 346 U. S. 827, 98 L. Ed. 352, 74 S. Ct. 47, reh. den. 346 U. S. 880, 98 L. Ed. 387, 74 S. Ct. 120). As a means of enforcement of the death penalty for crime, the only qualification apparently inserted is that the method of execution should not be needlessly cruel.

Eighth, counsel for the appellant contends the death penalty for the appellant is cruel and unusual and thus unconstitutional under Section 9 of the Bill of Rights of the Kansas Constitution and the Eighth Amendment to the United States Constitution. On this point counsel for the appellant argues the appellant has only an eighth grade education, had a father who mistreated him, has only a twelve to thirteen year old mind, has a passive personality, with aggressiveness in his relations with others, all as a result of inheritance and lack of adequate relationship to his environment; and that he could easily be led and goaded into doing things.

The legality of the death penalty has heretofore been discussed. The argument raised by counsel for the appellant on this point is one which should be directed to the trial court where the determination as to punishment in the instant case was made. These matters lie within the discretion of the trial court in resolving which punishment to inflict. We cannot say on the record here presented the trial court abused the exercise of its power of discretion in resolving which sentence to impose.

Ninth, the appellant contends the trial court erred in finding and assessing the death penalty on the ground that it was the policy of the state legislature, and that the court had no other alternative.

This point is based upon a statement made by the trial court in his

memorandum opinion dated November 25, 1966. The portion of this memorandum opinion, to which the appellant refers, reads as follows:

"The duty imposed on this Court, which duties the Court is not privileged to ignore, binds the Court to consider all of the evidence and upon such consideration to assess the extent of the punishment prescribed by the legislature in accordance with the heinous or gravity of the homicide. The punishment must rest on grounds relevant to achieve the State's objectives. The wisdom or deterrent effect of that penalty is for the legislature to determine and is not a justiciable issue. This Court cannot become an *Ad Hoc* legislature on the issue of penalty."

In the instant case the trial judge in his memorandum opinion, which was rather lengthy, disclosed that he advised the appellant concerning the statute in Kansas relevant to persons convicted of murder in the first degree. He so advised the appellant prior to his entry of a plea of guilty, indicating that if the case were tried to a jury the jury should determine the punishment to be inflicted. He further advised that if there was a plea of guilty the court would determine which punishment would be inflicted, and in so doing he was required to hear evidence. The trial judge stated in his opinion that he had "considered all of the evidence adduced at the hearing of this cause, carefully and exhaustively, with due regard for the oath to faithfully discharge the duties of District Judge, the duty owed to the Defendant and the duty owed to the community."

The statements upon which the appellant relies in the trial judge's memorandum opinion were no doubt prompted by the argument of counsel for the state, who did not believe in capital punishment and recommended a life sentence. We do not construe the remarks of the trial judge to mean that he felt obligated to impose the death penalty in the instant case.

In the case of *State v. Miller*, 165 Kan. 228, 194 P. 2d 498, the defendant entered a plea of guilty to first degree murder. Thereupon, the trial judge continued the matter in order for the state to present its evidence. On the day appointed the state presented its evidence and the defendant was allowed to make any statement that he wished. The court recited in the opinion: "The only issue the court has to decide is the punishment." In that case the judge sentenced the defendant to be hanged by the neck until dead at the Penitentiary at Lansing, Kansas. In the closing paragraph of the case the court states:

"In a case such as this the Legislature has placed upon the trial court the

authority and the duty of determining what sentence should be imposed upon the defendant. The record discloses the trial court performed that duty conscientiously and legally. Its judgment, therefore, should be affirmed and an appropriate order made to carry the sentence into execution. It is so ordered."

The trial judge no doubt relied upon *State v. Miller*, supra. It was a decision which must have weighed heavily upon the trial judge, and a decision which was guided, in his own words, "by a sense of solemn responsibility of my whole duty," that led to the pronouncement of the death penalty in the instant case. In so doing the trial judge carried out his duty legally and conscientiously.

The judgment and sentences of the lower court are affirmed.